**In re DOW CORNING CORPORATION,
Debtor.**

No. 95–20512.

United States District Court,
E.D. Michigan,
Northern Division.

Dec. 11, 2002.

## MEMORANDUM OPINION AND ORDER

HOOD, District J.

### I. BACKGROUND/SIXTH CIRCUIT OPINION SUMMARY

On May 15, 1995, the Debtor, Dow Corning Corporation ("Dow Corning" or "the Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On November 8, 1998, the Debtor and the Official Committee of Tort Claimants ("Tort Claimants' Committee") submitted a Joint Plan of Reorganization, amended on February 4, 1999. The Bankruptcy Court held hearings on the confirmation of the Amended Joint Plan commencing June 28, 1999, with closing arguments held on July 30, 1999. The Bankruptcy Court entered its Findings of Fact and Conclusions of Law, and Order Confirming the Amended Joint Plan on November 30, 1999. The Bankruptcy Court also entered various opinions and findings on November 30, 1999 and on subsequent dates relating to the Confirmation Order.[1]

---

1. The following are the opinions entered by the Bankruptcy Court relating to the Confirmation Order: *In re Dow Corning Corp. (Amended Opinion on the Classification and Treatment of Claims)*, 244 B.R. 634 (Bankr. E.D.Mich.1999); *In re Dow Corning Corp. (Amended Opinion on Good Faith)*, 244 B.R. 673 (Bankr.E.D.Mich.1999); *In re Dow Corning Corp. (Amended Opinion on Cram Down of Class 4: Is it Fair and Equitable to Cram Down Commercial Claims with Interest Less than Contract Rate?)*, 244 B.R. 678 (Bankr. E.D.Mich.1999); *In re Dow Corning Corp. (Amended Opinion Regarding Cram Down on*

Various parties appealed the Bankruptcy Court's Confirmation Order and Opinions to this Court. On November 13, 2000, the Court issued its Memorandum Opinion and Order,[2] which was appealed to the United States Court of Appeals for the Sixth Circuit.

On January 29, 2002, the Sixth Circuit Court of Appeals issued its Opinion and Judgment regarding various appeals from this Court's November 13, 2000 Memorandum Opinion and Order. *See, In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir.2002). The Sixth Circuit remanded the matter to this Court for additional findings of fact. Briefs were filed and a hearing on remand was held on the matter.

The Sixth Circuit affirmed this Court's ruling that non-consenting creditors may be enjoined, and further held that enjoining a non-consenting creditor's claim is only appropriate in "unusual circumstances." *Id.* at 656–58.[3] The Sixth Circuit set forth seven factors, six of which are substantive, which must be considered in order for a bankruptcy court to enjoin a non-consenting creditor's claims against a non-debtor:

1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

2) The non-debtor has contributed substantial assets to the reorganization;

3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

4) The impacted class, or classes, has overwhelmingly voted to accept the plan;

5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and;

7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.* The Sixth Circuit specifically addressed only four (the second, third, sixth and seventh factors) of the factors set forth above.

As to the second factor, the Sixth Circuit stated that the Bankruptcy Court did not make sufficiently particularized factual

---

*Class 18)*, 244 B.R. 696 (Bankr.E.D.Mich. 1999); *In re Dow Corning Corp. (Amended Opinion Regarding Cram Down on Class 15)*, 244 B.R. 705 (Bankr.E.D.Mich.1999); *In re Dow Corning Corp. (Amended Opinion on 11 U.S.C. § 1129(a)(9) Objections of the I.R.S. and Texas Comptroller)*, 244 B.R. 718 (Bankr. E.D.Mich.1999); and *In re Dow Corning Corp. (Opinion on Best–Interests–of–Creditors Test, Feasibility, and Whether Plan Proponents comply with the Applicable Provision of Title II)*, 244 B.R. 721 (Bankr.E.D.Mich.1999).

**2.** This Court's November 13, 2000 Memorandum Opinion and Order may be found at *In re Dow Corning Corporation*, 255 B.R. 445 (E.D.Mich.2000). The background and the underlying facts of the parties' various claims and the bankruptcy may be found in that Opinion.

**3.** The Sixth Circuit affirmed this Court's Opinion that under certain circumstances a bankruptcy court could enjoin non-consenting creditors' claims against a non-debtor, but remanded the case for findings of fact to support the Court's ruling, and for the inclusion of certain provisions regarding the government's claims. The Sixth Circuit also affirmed the district court's ruling that the Plan's classification of foreign claimants complies with the Bankruptcy Code's classification requirements. *Id.* at 656–58, 661–63.

findings relative to the Settling Insurers, Corning, Incorporated, the Dow Chemical Company,[4] and Dow's affiliates making significant contributions to the reorganization pursuant to the Plan. *Id.* at 659.

Regarding the third factor, the Sixth Circuit noted that the Bankruptcy Court's factual determination that the release and injunction provisions of the Plan are "essential" to the reorganization, was "ambiguous," holding that the Bankruptcy Court must clarify its inconsistent findings of fact in order for the Sixth Circuit to endorse enjoining claims against the non-debtors. *Id.* at 659.

Addressing the sixth factor, the Sixth Circuit found that as to the United States' claims under Class 15, the Bankruptcy Court's determination that the full payment requirement was met for all Class 15 members was clearly erroneous. *Id.* The Sixth Circuit held that "[b]ecause the Plan does not provide the United States adequate protection to meet the full payment requirement, we find this determination clearly erroneous." *Id.* The Sixth Circuit also set forth two provisions under a revised Plan which would meet the full payment requirement of the "unusual circumstances" test and the Code's "cram down" provision. *Id.* at 661.

The seventh factor was addressed and is encompassed by the above three factors. However, the Sixth Circuit held that the Bankruptcy Court did not make adequate findings as to these three factors.

As to the Foreign Claimant's appeal, the Sixth Circuit affirmed the Bankruptcy Court's finding that the claims within a given class were treated "substantially similar" and met the requirement under 11 U.S.C. § 1122(a). *Id.* at 662.

The matter was remanded to the District Court "for those matters needing additional findings." *Id.* at 662. This case is now before the Court on those remanded matters as set forth by the Sixth Circuit in its Opinion. It is noted that the parties' briefs address various factors and issues which the Sixth Circuit did not require the Court to address on remand. Based on the Sixth Circuit's Opinion, it appears that the only additional findings required are the factors addressed by the Sixth Circuit-specifically, the second and third factors under the "unusual circumstances" test regarding the injunction provision. However, the Court will make findings as to all the factors.[5]

As to the United States' claims under Class 15, the Sixth Circuit did not remand the matter for additional findings since it found that the Bankruptcy Court and this Court's determination that Class 15 claimants would be paid in full was clearly erroneous. Instead, the Sixth Circuit set forth two provisions which would meet the "unusual circumstances" test and the Code's "cram down" provision under a revised Plan. *Id.* at 661. It is noted that the United States' claim is not before this Court at this time since that matter has been resolved between the parties.[6]

## II. ARGUMENTS BY PARTIES WHO

**4.** Hereinafter, Corning, Inc. and Dow Chemical Co., when spoken of together, will be referred to as "Shareholders."

**5.** On December 13, 2001, the Honorable Arthur J. Spector entered an Order recusing himself from the bankruptcy matter. On the same date, the Court signed an Order with-

drawing the reference of the bankruptcy case from the Bankruptcy Court.

**6.** On September 19, 2002, the Court entered an Order approving the compromise of the United States' claims between the Debtor and the United States.

OPPOSE THE JOINT PLAN [7]

### A.   Nevada Class 5 Claimants

The Nevada Class 5 Claimants argue that the release and injunction provision does not apply to non-consenting creditors. The Nevada Class 5 Claimants claim that failure of the Debtor to present additional evidence requires denial of the requested third-party injunction.   However, other than the net worth of the Shareholders, the Nevada Class 5 Claimants do not specifically identify what other evidence is required.

The Nevada Class 5 Claimants address the six substantive factors and conclude that the injunction/release provision should not be applied.   In particular, the Nevada Class 5 Claimants assert that with respect to their "direct," as opposed to vicarious, claims against Dow Chemical, there is no identity of interests between the Debtor and Dow Chemical.   The Nevada Class 5 Claimants argue there is no evidence of substantial assets contributed by the Shareholders because the equity being contributed does not belong to the Shareholders, but instead to creditors of the Debtor.   These Claimants also argue that whether the contribution being made by the Shareholders is substantial must be measured against the Shareholders' net worth.   In addition, the Nevada Class 5 Claimants declare there is no need for a credit facility especially without a showing of a request for a traditional commercial loan by the Debtor or a showing of the Debtor's inability to obtain such a loan. The Nevada Class 5 Claimants also argue that the Insurance Allocation Agreement results in the dissipation of the Debtor's estate rather than augmentation of the estate.   These Claimants further argue

that the Plan does not provide for payment in full, particularly of the Nevada Class 5 Claimants' claims against Dow Chemical.

### B.   1300 Australian Claimants

The Australian Claimants reviewed the six substantive factors as to Dow Australia, PTY, Ltd. ("Dow Australia") and concluded that the injunction/release provision should not be applied.   The Australian Claimants assert that Dow Australia is a "separate corporate subsidiary" of the Debtor and that it is governed by Australian law.   The Australian Claimants argue that there is no identity of interest between the Debtor and Dow Australia and no ability to enjoin suits in Australia against Dow Australia.   In addition, these plan opponents claim that Dow Australia has given nothing of value to the Plan and that the record does not support any subsidiary or affiliate rights to the insurance policies funding the Plan.

### C.   Texas Class 5 Claimants

The Texas Class 5 Claimants/Lacy Claimants limit their arguments to scientific and medical causation issues.   However, scientific and medical causation is not an issue on remand.

### D.   Karen Hustead

Ms. Karen Hustead, a Class 9 Claimant, argues that there is inadequate funding of the Litigation Facility with respect to the disease claims of the non-breast implant claimants who elect not to settle.   The Court will construe Ms. Hustead's argument as an assertion that all claims under the Joint Plan will not be paid in full.

---

**7.**   Certain Underwriters at Lloyd's of London and the Hartford Insurers filed concurrences to the Plan Proponents' arguments.

## E. Marti Jacobs

Ms. Marti Jacobs requests that the Court reject the Plan Proponents' proposed Findings of Fact. She also addresses scientific and medical issues which are not issues on remand.

## F. Pennsylvania Class 5 Claimants

The Pennsylvania Class 5 Claimants' third-party release issue relates to the release of Health Care Providers and Physicians. It is noted that the Sixth Circuit's Opinion did not specifically address this particular issue, which leads this Court to conclude that its previous opinion was affirmed (since it was not reversed). The Pennsylvania Class 5 Claimants raise the same issues previously advanced to this Court. The Pennsylvania Class 5 Claimants also analyze the six factor analysis set forth by the Sixth Circuit.

The Physician Creditors' Committee responded to the Pennsylvania Class 5 Claimants' brief noting that the Sixth Circuit did not reverse this Court's Opinion regarding the release issue raised by the Pennsylvania Class 5 Claimants.

The Court incorporates its findings and Opinion previously issued. *See, In re Dow Corning Corp.*, 255 B.R. at 488–91.

## G. Beatrice Schroeder and Beatrix Shishido

Ms. Beatrice Schroeder claims that there was no overwhelming consent to the Joint Plan in her class, Class 5. Ms. Schroeder argues that Class 5 claimants were not provided proper notice when they voted. During oral arguments, she also raises the funding issue.

Ms. Beatrix Shishido asserts that the settlement offers are inadequate and that there is faulty data regarding the causation issue.

It is noted that the following issues are not before the Court on remand: inadequate notice regarding voting; funding; settlement offer amounts; and causation.

## III. ANALYSIS

### A. Authority to make the additional findings

■ On December 13, 2001, the Honorable Arthur J. Spector, the bankruptcy judge over the matter, issued a Notice of Recusal, recusing himself from all further proceedings in this bankruptcy matter. This Court issued an Order Withdrawing the Reference of this bankruptcy action from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d) on December 13, 2001.

The Federal Rules of Civil Procedures apply to bankruptcy actions, unless a more specific bankruptcy rule governs. Bankruptcy Rule 9028. Fed.R.Civ.P. 63 provides,

> If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify against without undue burden. The successor judge may also recall any other witness.

Fed.R.Civ.P.63. The rule "authorizes the substitute judge to make a finding of fact at a bench trial based on evidence heard by a different judge." Fed.R.Civ.P. 63 Advisory Committee Notes (1991 Amendment). The trial court has the discretion to decline to reopen the proofs. (*See, Ramsey v. United Mine Workers of America*, 481 F.2d 742, 753 (6th Cir.1973)(up-

holding discretionary decision not to re-open the record on remand where decision remanding case to district court did not suggest that the record should be re-opened for the taking of additional evidence)).

The Court certifies it is familiar with the record before the Bankruptcy Court. The Court was assigned as the District Court "appeals" judge of this matter at the inception of the bankruptcy action in 1995. Since that time, various appeals and motions to withdraw the reference have been filed before the Court. The Court was in attendance at various times during the confirmation hearing held by the Bankruptcy Court. The Court had before it the transcript of the confirmation hearing when it originally reviewed the numerous appeals of the Bankruptcy Court's Confirmation Order. The Court is familiar with the record before the Bankruptcy Court and can proceed with the additional findings remanded by the Sixth Circuit.

Relative to the additional evidence, the Sixth Circuit's Opinion did not suggest that proofs be reopened, but only that the matter be remanded "for those matters needing additional findings." *In re Dow Corning Corp.*, 280 F.3d at 663. It is noted that the Plan Proponents claim there was sufficient evidence presented at the confirmation hearing to support confirmation of the Joint Plan and the issuance of the release and injunction provisions under the Joint Plan.

### B. Findings

#### 1. First Factor/Identity of Interests

##### a. Shareholders

■ Dow Chemical Company ("Dow Chemical") and Corning, Inc. ("Corning") are the Shareholders of the Debtor. (Amended Joint Plan, ¶¶ 1.166, 6.16;

Funding Payment Agreement, p. 1). There is essentially no dispute that the Personal Injury Claims against the Shareholders, Dow Chemical and Corning, all arise from Dow Corning's products. The Sixth Circuit has noted that neither Dow Chemical nor Corning ever manufactured silicone implant products. *In re Dow Corning Corp.*, 113 F.3d 565, 570 (6th Cir. 1997). The Sixth Circuit has also recognized that, "[t]he claims against the shareholders arise from an identical set of facts" as those that arose from the claims against Dow Corning and are "essentially the same exact cases." *Id.* The Debtor and the Shareholders have Shared Insurance Assets. (Funding Payment Agreement, Art. 2.01; Insurance Allocation Agreement).

The Court notes that some Claimants assert that the allegations against Dow Chemical are not in fact product liability claims, however, the central allegations involve the Debtor's products. *See, Dow Chemical v. Mahlum*, 114 Nev. 1468, 970 P.2d 98, 106–07 (1998). Even in the *Mahlum* case, the Nevada Supreme Court found that Dow Chemical and the Debtor worked together on the development of silicone. *Id.*, 970 P.2d at 115–18. Furthermore, although identity of interest is most often shown by an indemnity relationship, such a relationship is not the only means of establishing identity of interest. In this case, such a relationship exists in many instances. In the case of the Nevada Class 5 Claimants, identity of interest is shown by the fact that in order to find liability by Dow Chemical, liability of the Debtor by manufacturing of the silicone breast implants or silicone gel would have to be shown. *Mahlum*, 970 P.2d at 107.

The Court finds that there is an identity of interests between the Debtor and its Shareholders, Dow Chemical and Corning. Dow Chemical and Corning are the Share-

holders of the Debtor and all three have shared insurance assets. The personal injury claims against the Debtor, and the related claims against the Shareholders all involve the Debtor's manufacturing of silicone breast implants or silicone gel. The evidence in the *Mahlum* case, as noted above, show that Dow Chemical and Dow Corning were involved, together, in the development of silicone.

### b. Debtor's Subsidiaries and Affiliates

The Australian Claimants argue that there is no identity of interest between Dow Australia and the Debtor. The Australian Claimants, however, did not submit any evidence showing the product at issue was not manufactured by the Debtor. The Australian Claimants have not shown that their claims against Dow Australia do not involve the Debtor's product. In order to prove any alleged wrongdoing by Dow Australia for selling the Debtor's products to the Australian Claimants, the Australian Claimants will be required to prove that the Debtor's product caused the injuries alleged.

Specifically, as to Dow Australia, testimony at the Confirmation Hearing shows that Dow Australia is an affiliate of the Debtor and that the Debtor owns 100% of Dow Australia's common stock. (July 14 Tr. at 75–76, 105 (Newman); Disclosure Statement, Ex. E). The claims against the subsidiaries, although the theories of liability may be different, all involve the Debtor's products. A trial of these claims to proceed against the Debtor's Shareholders, its subsidiaries or affiliates outside of the Joint Plan structure would deplete the assets of the estate. The Debtor would be directly involved in these cases since its products are involved. Participation in numerous lawsuits, in multiple venues, would defeat the Debtor's reorganization efforts under the Joint Plan. In fact, it is the reason the Debtor claims it filed bankruptcy. The Debtor's subsidiaries and affiliates are interdependent on the Debtor. This is evidenced by the shared insurance between the Debtor and its subsidiaries and the consolidated financial statements of the Debtor and its subsidiaries. (Disclosure Statement, Exs. E and F). The subsidiaries, such as Dow Australia, are assets of the Debtor. Any litigation against the Debtor's subsidiaries inevitably affects the value of the Debtor's assets.

### c. Settling Insurers

The only claims where the Settling Insurers have not been released are those involving the United States. As noted above, the claims by the United States have been resolved. The Order Authorizing and Approving Compromise and Settlement Between Dow Corning Corporation and [certain Hartford Insurers], dated August 11, 1995, at ¶¶ 5, 13A (docket # 930); and Order Authorizing and Approving Compromise and Settlement with the London Market Insurers, dated March 25, 1996, at ¶¶ 5, 19 (docket # 5253), see, *In re Dow Corning Corp.*, 198 B.R. 214 (Bankr.E.D.Mich.1996) (approving settlements with insurance companies), were not appealed and are now final. In any event, to allow any reimbursement claims to be tried twice, once within the Litigation Facility and once outside of the Litigation Facility against the Settling Insurers, would be duplicative and could result in duplicative payments for the same injury. The Debtor would incur duplicative expenses to defend the litigation, all of which waste estate assets and judicial resources. Determining which of the Debtor's many primary and excess policies could have applied to a particular Breast Implant Claim prior to the settlements with the Settling Insurers would require extensive involvement by the Debtor.

## 2. Factor Two/Contribution of Substantial Assets

### a. The Shareholders' Contribution

#### i) Equity/Profits

The Joint Plan provides that the Shareholders fund the Joint Plan with over two billion dollars ($2.35 billion) of their equity and future profits from the Debtor. The Shareholders agreed to fund the Joint Plan even though they and the Debtor have vigorously contested the causation issue as it relates to the claim that the silicone gel causes disease. (July 14 Tr. at 29–30 (Newman)). As part of the bargain, the Shareholders committed to contribute their equity based on the parties' agreement that the Joint Plan include release and injunction provisions favorable to them. (June 28 Tr. at 158–59 (Jacks)); (July 14 Tr. at 29–30, 94 (Newman)). Arthur Newman of The Blackstone Group, the Debtor's financial advisor and Investment Banker, testified, "[the Shareholders have] consented to the joint plan which pays out lots of money to tort claimants on claims that they and Dow Corning believe have little or no value. And whatever gets paid to tort claimants is clearly a direct reduction of their equity investment in Dow Corning." (July 14 Tr. at 29–30 (Newman)).

Tommy Jacks,[8] a member of the Tort Claimants' Committee involved in the negotiations of the Joint Plan with the Debtor, testified that, as a result of the Shareholders' contributions, "the value that's being provided in the joint plan as opposed to the prior plans [that] Dow Corning had offered, is vastly greater." (June 28 Tr. at 158 (Jacks)). "[A]t least half a billion dollars in value is provided here in excess of that that was provided in Dow Corning's previous offer and it's provided on a much more accelerated basis." (Id. at 135). Mr. Jacks noted that the funding "is being used to pay claims . . . of women who have the right to accept settlements under the plan without proving any connection between their conditions on the one hand and silicone exposure on the other hand." (Id. at 159). "The shareholders therefore are giving up the future value of their equity in substantial amounts and are also giving up the right to contest as they have at every stage, the idea that silicone exposure caused any of the diseases they're being compensated [for] under the plan. On that basis I felt and the committee felt that the shareholders were giving valuable consideration." (Id. at 159). Mr. Jacks testified that the value that is being provided in the Joint Plan, as opposed to the prior plans Dow Corning offered, is vastly greater, at least half a billion dollars or a billion dollars greater than the previous plans. (Id. at 158). The increased value clearly affects the future value of the equity of the shareholders which they have relinquished in order to provide the funding of the Joint Plan. (Id.) Mr. Jacks concluded that the Shareholders are giving up the future value of their equity in substantial amounts.

---

8. Tommy Jacks is a lawyer from Texas. He was licensed in 1971 and has had a considerable amount of experience in the area of personal injury cases, including product liability cases and other personal injury litigation. Mr. Jacks first became involved with the breast implant litigation in 1991. He represents in excess of 400 breast implant cases. Mr. Jacks has been involved in the trial of cases against Dow Corning and Dow Chemical. Beginning in 1995, he began serving on the Tort Claimants' Committee. Since 1996, he has served as a member of a subcommittee of the Tort Claimants' Committee charged with the responsibility for negotiating with the Unsecured Creditors' Committee and the Debtor. He has been extensively involved in the Plan process. (June 28 Tr. at 130–132 (Jacks)).

*(Id.* at 159). Additionally, the Shareholders are waving their right to contest that silicone exposure caused any of the diseases claimed by the Claimants and any compensation under the Joint Plan. *(Id.)* Because of the increased benefits of settlement under the Joint Plan, the passage of time, and the science information now available, fewer Claimants will choose to litigate. *(Id.* at 162).

The Nevada Class 5 Claimants argue that the reduction in equity by the Shareholders should not be considered a "contribution" as that equity belongs to the creditors. Noting § 726 and § 1129(a)(7)(A)(ii) which provide that equity is lowest in the distribution scheme of Chapter 11, the Nevada Class 5 Claimants point to Exhibit H of the Disclosure Statement for support. The Nevada Class 5 Claimants state that Exhibit H shows net proceeds available for unsecured claims, personal injury claims and equity in the amount of $4,037,000,000 versus $3,750,000,000 under the Joint Plan. These numbers show that $2.35 billion is available in assets to pay now "rather than over decades as provided in the Plan." (Nevada Class 5 Claimants' Br., pp. 16–18).

The Proponents counter that diminution of equity is not required by the Code and that equity holders also have rights under 11 U.S.C. § 1129(b). The Proponents argue that a dispute exists regarding whether tort claimants or Shareholders have the right to the value of the Debtor. The Debtor further argues that although claimants believe their claims are valued equal to the value of the Debtor, the Shareholders believe the scientific evidence bodes to the contrary. Absent a consensual plan, the Shareholders claim is that they would be able to challenge causation by objection to the treatment of the tort claimants' claims. The Plan Proponents claim that the waiver of this right to such an objection is a substantial contribution to the Plan.

As previously found by the Bankruptcy Court and this Court, the testimonies of Messrs. Newman and Jacks on this point are credible and persuasive. The Shareholders' contribution of over two billion dollars of their equity to pay contested claims under the Joint Plan without requiring proof of disease causation is a substantial contribution to the Debtor's reorganization.

### ii) Credit Facility

The Shareholders have also agreed to fund a credit facility from which the Debtor may borrow up to $300 million in the ten-year period after the Effective Date to assist in meeting its funding obligations to the Settlement Facility. (Proponents' Ex. 2, Funding Payment Agreement, §§ 3.01, 3.02). The Joint Plan requires the Debtor to pay approximately $1.3 billion (valued as of June 30, 1999) in cash and ten-year unsecured Senior Notes to other Unsecured Claimants (i.e., commercial creditors) in Class 4, in addition to the $2.35 billion Net Present Value ("NPV") required to resolve Personal Injury Claims. *(See,* Disclosure Statement, § 1.3.A). The Debtor's aggregate funding obligation to the Settlement Facility during its 16–year life is $3.172 billion. (Proponents' Ex. 2, Funding Payment Agreement, § 2.01). The Debtor is obligated to fund approximately $2.5 billion, or 80%, of that amount during the first ten years after the Effective Date. *(Id.,* §§ 2.01(a), (c)). Mr. Newman testified that the Debtor's consolidated operations will provide 60% of the cash required during the first five years after the Effective Date, with the remainder from insurance proceeds, and that "substantially all the payments starting in year six will come from Dow Corning's operations." (July 14 Tr. at 25–26 (Newman)).

The Shareholders' $300 million credit facility will provide a substantial portion of the necessary funds should the Debtor's own cash-flow fall short. The Shareholders' credit facility provides the Debtor with a guaranteed source of funds over the 10-year period following the Effective Date. The payouts to tort claimants are expected to be the heaviest during this period. (Proponents' Ex. 2, §§ 2.01(c), 3.01); (July 14 Tr. at 28–29 (Newman)). Even if the Debtor could obtain financing from other sources, financing from the Shareholders' credit facility will be on better terms than in other markets and no fees will be required. (July 14 Tr. at 29 (Newman)). The loans would be unsecured and subordinated to the Debtor's other Joint Plan funding obligations. (Proponents' Ex. 2, § 3.11). Mr. Newman testified the "below market" terms are "clearly significant" and would not otherwise be available to the Debtor for a similar loan facility. (July 14, Tr. at 29–30 (Newman)).

The Nevada Class 5 Claimants argue that the evidence does not show that funding from the credit facility is necessary to the plan or reorganization. They note a news article dated February 4, 2002 reporting the Debtor's investment in a foreign manufacturing facility as support for the lack of demonstrated need for the guarantee of a loan from the credit facility. (Nevada Class 5 Claimants' Brief, p. 6). Yet, on the issue on whether or not the Plan provides that claims be paid in full, the Nevada Class 5 Claimants challenge the Plan's funding.

The Nevada Class 5 Claimants' argument that the Debtor has not shown it could not obtain a commercial loan is without merit since the evidence supports the availability of the credit facility funds on terms better than those provided commercially. (July 14, Tr. at 29–30 (Newman)). The credit facility is important in that it insures that funds will be available for the Debtor to meet its obligations during the first ten years of the Plan, which is the time when the funding requirements are at their highest. Other than the newspaper article presented, no other evidence was presented to rebut the testimony presented at the Confirmation Hearing that the credit facility is a significant and substantial contribution to the Joint Plan.

The Debtor will emerge from bankruptcy with substantial debt and could have difficulty obtaining sufficient credit in the capital markets if it has difficulty funding its Joint Plan obligations from its operating income. Changes in Dow Corning's business or in the economy may impair the Debtor's ability to obtain third-party financing if required under its funding obligations. (July 14 Tr. at 20–21 (Newman)). Mr. Newman testified that in any single year, "market forces could cause cash flows to decline in a single year and rise in another year." (*Id.*) No one has contradicted this testimony. The Court finds that the $300 million credit facility is a significant and substantial contribution to the Joint Plan and assures the feasibility of the Joint Plan.

### iii) Shared Insurance

There is no dispute that the Debtor and its Shareholders have various shared insurances and they have entered into an Insurance Allocation Agreement. As to Dow Chemical, the Insurance Allocation Agreement notes that Dow Chemical purchased certain excess liability insurance policies that provide coverage to Dow Chemical and Dow Corning. (Proponents' Ex. 3, Insurance Allocation Agreement, p. 1). It is further noted that Dow Corning purchased other insurance policies that provide coverage to both Corning and Dow Chemical. (*Id.*) The Insurance Allocation Agreement provides that Dow Chemical

give up potential claims to hundreds of millions of dollars by allocating at least 75% of the shared insurance coverage to Dow Corning. (Proponents' Ex. 70, Aff. of Scott Gilbert, ¶ 17; July 2 Tr. at 22, 30 (Gilbert)). The Debtor and Corning have agreed to allocate the lesser of $285 million or 25% of that coverage to Dow Chemical. (Proponents' Ex. 3, ¶ 2). Corning's agreement allows its equity in Dow Corning to be used to pay claims that might otherwise have been paid from the insurance proceeds that the Insurance Allocation Agreement allocates to Dow Chemical. (*See*, Amended Joint Plan, ¶¶ 6.16.3 and 6.16.4).

By entering into the Insurance Allocation Agreement with its Shareholders, the Debtor has immediate access to more than $450 million from insurance settlements, as well as hundreds of millions of dollars of additional insurance proceeds over the remaining life of the Joint Plan. Scott David Gilbert, an attorney and the principal insurance negotiator and strategist for the Debtor, testified that the Insurance Allocation Agreement is essential for Dow Corning to meet its future funding commitments under the Joint Plan and it is a central component of the Joint Plan and integral to the Debtor's reorganization. (July 2 Tr. at 22, 25–26, 30 (Gilbert)). Without the Insurance Allocation Agreement, Mr. Gilbert testified that the Debtor would not have been able to make the initial $985 million payment to the Settlement Facility. (July 2 Tr. at 23–24 (Gilbert)). Mr. Gilbert further testified that Dow Chemical essentially relinquished its claims against the assets of the joint insurance coverage, which was in dispute between Dow Chemical and the Debtor, because of the first-come, first-served nature of these shared insurance policies. (July 2 Tr. at 31–32 (Gilbert)). There is undisputed testimony at the Confirmation Hearing that the shared insurance proceeds are all free and clear of competing claims under the Insurance Allocation Agreement. (Proponents' Ex. 70, ¶¶ 2, 17, 19–21, 24; July 2 Tr. at 22, 30 (Gilbert); and July 14 Tr. at 22–26 (Newman)).

Mr. Gilbert testified that the Insurance Allocation Agreement was the result of "vigorous and contested" negotiations between the Debtor and its Shareholders. (July 2 Tr. at 40 (Gilbert); Proponents' Ex. 70, ¶¶ 15, 23). Without the assurances of the release and injunction provision, the Shareholders would not have agreed to enter into an Insurance Allocation Agreement with the Debtor. (July 2 Tr. at 36, 44–45 (Gilbert); Proponents' Ex. 70, ¶ 18).

The Nevada Class 5 Claimants argue that the Insurance Allocation Agreement dissipates rather than augments the estate of the Debtor. This argument is not supported by the record. The Nevada Claimants' arguments presumes that the six percent (6%) of non-consenting claimants (versus 94% voting in favor of the Plan) are the only persons with rights against the Shareholders' 25% remaining interest in the insurance policies. No other claims are presumed against the Shareholders for any other liability except those also asserted against the Debtor in this bankruptcy. The Nevada Class 5 Claimants' emphasis on the Bankruptcy Court's use of the word "important" contribution as opposed to "substantial" contribution to the reorganization does not logically result in the conclusion they posit-that the Bankruptcy Court "knew that the Shareholders had likely received from the debtor much more than the Shareholders had contributed to the estate." (Nevada Claimants' Brief, p. 23).

The Court finds that shared insurance between the Shareholders and the Debtor is a substantial contribution to fund the Joint Plan of reorganization. The Shareholders' contribution of its rights under

the shared insurance policies significantly contribute to the funding of the Joint Plan and its feasibility.

### iv) Indemnity and Contribution Claims

Pursuant to the Sixth Circuit's previous ruling in this matter, more than 14,000 cases against Dow Chemical and Corning were transferred to this Court, the Sixth Circuit finding that those cases were related to Dow Corning's bankruptcy action. *In re Dow Corning Corp.*, 86 F.3d 482 (6th Cir.1996). The Shareholders have asserted indemnity and contribution claims against the Debtor. Absent the injunction and release provisions under the Joint Plan, the Shareholders would not have agreed to waive the indemnity and contribution claims against the Debtor. As the Sixth Circuit has noted, any claims for indemnification and contribution asserted against the Debtor would affect the size of the Debtor's estate and the Debtor's ability to resolve its liabilities and proceed with reorganization. *Id.* at 494. The Court finds that without the release and injunction provisions, the Shareholders' claims of contribution and indemnification would substantially affect the estate of the Debtor and its ability to proceed with reorganization by reducing the availability of the Debtor's assets which the Debtor would have to expend to defend the contribution and indemnification claims by the Shareholders. The Plan Opponents have not submitted any evidence to the contrary.

### b. The Subsidiaries and Affiliates' Contribution

The Australian Claimants argue that it has not been shown that Dow Australia has contributed any assets to the Joint Plan. The Australian Claimants argued at the hearing that based on the Supreme Court case, *Bank of America Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle Street Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999), there is insufficient evidence regarding the value of Dow Australian's contribution to the Joint Plan. The Australian Claimants argue that the value of the credit facility is merely contingent. Therefore, the value of the contributions made by the Debtor's Shareholders and subsidiaries is merely contingent liability. The Australian Claimants further assert that the *203 N. LaSalle* "new value" exception does not allow for "contingent" liability but "absolute" liability.

In response, the Plan Proponents argue that *203 N. LaSalle* is inapplicable because the issue in that case involved the "cram down" provision of the Bankruptcy Code. The Classes at issue, Classes 5 and 6.1 (foreign class), were not rejecting classes. Therefore, *203 N. LaSalle* is not applicable to the remanded issue before the Court, which is to make additional findings to demonstrate that an injunction is appropriate in this case.

This Court's reading of the *203 N. La-Salle* case shows that the case involves the "cram down" and absolute priority provision of the Bankruptcy Code, 11 U.S.C. § 1129(b)(2)(B)(ii), which is not at issue on remand. *203 N. LaSalle*, 526 U.S. at 437, 119 S.Ct. 1411. As noted by the Plan Proponents, the Classes at issue, and, specifically, the Australian Claimants in Class 6.1, were not rejecting classes. The Court finds *203 N. LaSalle* is inapplicable to the issue before the Court. The Court notes that the Supreme Court declined to address the issue of whether some form of market valuation may be available to test the adequacy of an old equity holder's proposed contribution pursuant to an analysis under 11 U.S.C. § 1129(b)(2)(B)(ii). *See, 203 N. LaSalle*, 526 U.S. at 458, 119 S.Ct. 1411.

The record shows that the Debtor's subsidiaries and affiliates are contributing cash that will fund payments under the Plan, including Dow Australia. (July 14 Tr. at 102, 105 (Newman)). It is true that Mr. Newman could not specifically identify the amount of cash Dow Australia is contributing. However, there is no evidence to the contrary. Mr. Newman testified that Dow Corning operates on a consolidated basis with its subsidiaries and affiliates, which is reflected by the financial statements in the Financial Disclosure. (Disclosure Statement, Ex. F).

The Australian Claimants argue that Dow Australia contributes nothing to the Plan and that there is no evidence that the insurance relates to Dow Australia. However, the Insurance Allocation Agreement specifies:

> This Insurance Allocation Agreement (the "Agreement") is entered into ... by and between Dow Corning Corporation on behalf of itself and its present wholly owned subsidiaries (collectively, "Dow Corning") and the Dow Chemical Company ...

(Proponents' Ex. 3, Insurance Allocation Agreement). The Amended Joint Disclosure Statement lists Dow Australia PTY, Ltd. as a DCC Asian subsidiary, 100% owned by the Debtor. (Amended Joint Disclosure Statement, p. 33). Paragraph G of the Amended Joint Disclosure Statement, entitled "Insurance Settlements" notes "DCC and its officers, directors, subsidiaries and its Shareholders (in limited instances) are the insured under the Primary Policies." (Amended Joint Disclosure Statement, p. 44, ¶ G). The projected financial statements for the Debtor and its subsidiaries, estimate that the total value of the Debtor's long-term insurance receivable from all insurance sources to be $1.539 billion. (July 14 Tr. at 53 (Newman); Disclosure Statement, Ex. F). The

Australian Claimants failed to indicate that Note 2 to the Disclosure Statement explains that about half of the insurance source, amounting to $776.8 million, is attributable to "all other sources of insurance." (Disclosure Statement, Ex. F, n. 2). The Disclosure Statement notes that those insurance sources include both primary and excess policies that insure the Debtor and its subsidiaries. (Disclosure Statement, p. 44).

There is no dispute that the Debtor has numerous subsidiaries and affiliates worldwide and that its operations are conducted through itself and those subsidiaries and affiliates. (Disclosure Statement, pp. 31–33, ¶ 3.2; Ex. E). Mr. Newman testified that the subsidiaries and affiliates are contributing cash to pay the Personal Injury Claims under the Joint Plan. (July 14 Tr. at 104–05; Proponents' Ex. 62; *In re Dow Corning Corp.*, 255 B.R. 445, 484 (E.D.Mich.2000)). The amount specific to each subsidiary or affiliate was not enumerated. The total amount attributable to the Debtor and its subsidiaries is $776.8 million. The subsidiaries and affiliates, as named insureds under the shared insurance policies noted above, have rights in the insurance policies being used by the Debtor to fund the Joint Plan and have waived their claims of contribution and indemnification. As previously noted, the Insurance Allocation Agreement provides that a substantial amount of the insurance policies will be used to fund the Joint Plan. The consolidated financial projections of the Debtor, its subsidiaries and affiliates, was used to support the feasibility of the Joint Plan, including the cash required at closing. (Disclosure Statement, Ex. F (Dow Corning Corporation and Subsidiary Companies' Projected Financial Statements); Proponents' Ex. 2 (Cash Reconciliation for Debtor on Effective Date)). The affiliates and subsidiaries are making a substantial contribution to the Joint Plan.

The parties opposing the Plan have not submitted any evidence to rebut the testimony presented by the Plan Proponents.

### c. The Settling Insurers' Contribution

The Debtor has entered into various settlements with 33 Settling Insurers as of November 30, 1998. The Bankruptcy Court previously approved the settlements between the Debtor and the Settling Insurers. (Disclosure Statement, Ex. G). The settlements with the Settling Insurers have secured in excess of $1 billion in insurance coverage to fund the Joint Plan. (*Id.*) Included in the settlement are hundreds of millions of dollars in cash payments. (*Id.*; Proponents' Ex. 70, ¶ 6). Mr. Newman testified that on the Effective Date of the Joint Plan, the Debtor will receive at least $157 million in proceeds from settlements involving its own insurance policies, in addition to at least $454 million in insurance settlement proceeds under the Insurance Allocation Agreement. (July 14, Tr. at 22–23; Proponents' Ex. 62). Mr. Newman further testified that the contributions by the Settling Insurers will constitute over 40% of the total sources of cash available to the Debtor on the Effective Date of the Joint Plan. *Id.* By entering into settlements with the Settling Insurers, the Debtor's estate has been substantially preserved because there will be no need to litigate the issue of whether and when an insurer's indemnification obligations are triggered. *In re Dow Corning,* 198 B.R. at 225–26.

The Nevada Class 5 Claimants argue that the Settling Insurers' contribution is not substantial. However, they have not submitted sufficient evidence to rebut the Plan Proponents' showing that the Settling Insurers' contribution to the Joint Plan is substantial and essential to the Joint Plan. The release and injunction provision is essential as to the Settling Insurers because continued litigation by any party against those insurers, who have already paid their policy proceeds to the Debtor, would be duplicative. The drain on the financial resources of the estate because of the duplicative litigation is not warranted. A party who has a claim to the insurance proceeds contributed by the Settling Insurers can assert them within the Joint Plan structure and should not be allowed to pursue them elsewhere.

### 3. Factor Three/Whether the release and injunction provisions are "essential"

In its Opinion, the Sixth Circuit noted,

In its November 30, 1999 Findings of Fact and Conclusions of Law, the bankruptcy court concluded that the release and injunction provisions were "essential to the reorganization pursuant to the Plan." However, the bankruptcy court subsequently interpreted the release and injunction provisions to apply only to consenting creditors, implying that enjoining non-consenting creditors is not essential to the reorganization. It explained that it found the provisions "essential" in order to "obviate the need for remand in the event [the bankruptcy court is] reversed on appeal with regard to the scope and permissibility of the release and injunction provisions." *In re Dow Corning Corp.,* 244 B.R. at 747. These are inconsistent fact findings that the bankruptcy court must clarify in order for us to endorse enjoining claims against non-debtors.

*In re Dow Corning Corp.,* 280 F.3d at 659.

This Court agrees that the Bankruptcy Court's findings were inconsistent and rejected the Bankruptcy Court's findings in its previous Opinion. *In re Dow Corning Corp.,* 255 B.R. 445, 480, 494 (E.D.Mich. 2000). Based on this Court's previous

findings on the issue, there is no longer an inconsistency. Having withdrawn the reference, this Court now has original jurisdiction over all proceedings, including the clarification sought by the Sixth Circuit. The Sixth Circuit has now ruled that enjoining non-consenting creditors may be allowed if the Bankruptcy Court finds that such an injunction is essential to the Plan for reorganization of the Debtor. This Court will address below its findings relative to whether enjoining consenting and non-consenting creditors is essential to the reorganization of the Debtor.

The Court first notes that the Nevada Class 5 Claimants argue that the injunction is not essential to the Joint Plan because § 8.3 does not provide a right of contribution to the Shareholders. The Nevada Class 5 Claimants argue that their claims against Dow Chemical are "direct." By this they mean their claims are not "vicarious." It is not disputed that the Nevada Class 5 Claimants' claims are "direct" against Dow Chemical. However, the Sixth Circuit has already noted that the claims against the Shareholders are related to the claims against the Debtor and that any claims for indemnification and contribution asserted against the Debtor by the Shareholders would affect the size of the Debtor's estate and the Debtor's ability to resolve its liabilities and proceed with reorganization. *In re Dow Corning Corp.*, 86 F.3d at 494. There is no dispute that the Shareholders have asserted claims for contribution and indemnification. The issue of whether the Shareholders have a "right" to contribution or indemnification is an issue to be resolved during litigation. If the Shareholders chose not to waive these claims, the Debtor would then have to defend any such claims. As previously noted, there are more than 14,000 lawsuits filed against the Shareholders before this Court. Any defense by the Debtor of the contribution or

indemnification claims against any of the 14,000 cases against the Shareholders would substantially impact the size of the Debtor's estate.

The Australian Claimants argue that the release is not essential as to Dow Australia because the Australian Claimants have no claims against the Debtor and Dow Australia has not asserted claims for contribution or indemnity against Dow Corning. As noted previously, even if Australian Claimants do not have a claim against Dow Corning, in order to find Dow Australia liable for selling the Debtor's product, the issue of whether the Debtor's product caused the injury must first be determined. Moreover, Dow Australia has filed a contribution claim against the Debtor. (See, Proof of Claim No. 0519972–00).

The Australian Claimants further argue that the Court is without jurisdiction to enjoin suits in Australia against Dow Australia. It is noted that the Australian Claimants raised this argument before the Sixth Circuit. The Sixth Circuit's Opinion remanded the matter for further factual findings on the appropriateness of the release. Therefore, the Sixth Circuit implicitly overruled the Australian Claimants' argument that the release was illegal for lack of jurisdiction. *(See, United Distribution Cos. v. F.E.R.C.*, 88 F.3d 1105, 1148 (D.C.Cir.1996)(a remand for further proceedings on a specific issue implicitly rejects a lower court's jurisdiction over issues not remanded)). The Court agrees that generally, there is a presumption against extraterritorial application of United States law as argued by the Australian Claimants. However, in the bankruptcy context, that presumption does not apply if ignoring the bankruptcy court orders would have "substantial effects within the United States." *In re Simon*, 153 F.3d 991, 997 (9th Cir.1998). As noted previ-

ously, Dow Australia is contributing cash and insurance assets to the Joint Plan and Dow Australia has filed a contribution claim against the Debtor. If the Australian Claimants were allowed to pursue their claims against Dow Australia, the Debtor would lose Dow Australia's contribution and would also have to defend its products in the Australian courts.

█ It is noted that the Australian Claimants have submitted themselves to this Court's jurisdiction by participating in this bankruptcy action. When a creditor submits to bankruptcy court jurisdiction by filing a proof of claim in order to collect its debt, the creditor is subject to the court's orders and any discharge order pursuant to 11 U.S.C. § 524. *Id.* at 997. International comity does not prohibit an injunction issued by the bankruptcy court. *Id.* at 997–98. It is noted that the Bankruptcy Code extends the bankruptcy court's power over the debtor's legal and equitable interests in property "wherever located." *Id.* at 998; 11 U.S.C. § 541. The bankruptcy was initiated in the United States and the Australian Claimants participated in the action. It is noted that the release and injunction provisions do not apply to the Australian courts but to the participants in the bankruptcy proceedings, specifically, the Debtor, Dow Australia and the Australian Claimants. The discharge provision of the Bankruptcy Code, 11 U.S.C. § 524, does not apply to courts outside of the United States but to those creditors who enjoyed the benefits of participating in the United States bankruptcy. *In re Simon,* 153 F.3d at 999. The release and injunction provisions in this case do not conflict with the sovereignty of the Australian courts since those provisions do not apply to the Australian courts but to those who participated in the bankruptcy action, such as the Australian Claimants. It is further noted that there is no compet-

ing bankruptcy proceeding in Australia at this time, therefore, there is no conflict regarding the bankruptcy laws at issue. The Australian Claimants are therefore bound by the Court's orders because they participated in the bankruptcy action.

Professor Georgene Vairo, Professor of Law at Loyola Law School in Los Angeles, California, and Chairperson of the Dalkon Shield Trust, testified at the Confirmation Hearing based on her experience in the *A.H. Robins* case involving the Dalkon Shield product. She noted that the third party release in that case "facilitated our ability to make our decisions as expeditiously as possible and in the best interest of all claimants" and "facilitates the job of the trust in terms of being able to control the process of resolving various claims." (June 30 Tr. at 140, 151 (Vairo)). This testimony demonstrates the necessity of a third party release in this case.

Without a release and injunction, the Shareholders would not have agreed to a plan at the funding level of the current Plan or one that involved the Shareholders' rights to hundreds of millions of dollars of insurance proceeds. (July 14 Tr. at 34 (Newman); Proponents' Ex. 70, ¶ 18). The Debtor, alone, would have been unable to fund the Plan at its current level without the insurance proceeds and would have had to stay in bankruptcy. The Shareholders and the subsidiaries/affiliates would each have potential contribution and indemnity claims against the Debtor if litigation over the Debtor's products were asserted against the non-debtors and would have no interest in relinquishing any right to the insurance. As noted by the Bankruptcy Court and the Sixth Circuit, claims for indemnification and contribution would affect the size of the estate and the length of time the bankruptcy proceedings will be pending, as well as Dow Corning's ability to resolve its liabilities and proceed

with reorganization. *See, In re Dow Corning Corp.*, 244 B.R. 721, 745 (Bankr. E.D.Mich.1999); *In re Dow Corning Corp.*, 86 F.3d at 494.

The Debtor has consistently maintained that the main reason the Debtor filed for bankruptcy was because of the thousands of pending lawsuits against it claiming its silicone gel products caused injury and disease. The Joint Plan submitted by the Debtor and the Tort Claimants' Committee was to resolve the pending litigation against the Debtor, its Shareholders and its subsidiaries and affiliates. Testimony at the confirmation hearing supports the Debtor and the Tort Claimants' Committee's position that without a release and injunction, the Shareholders would not have agreed to a plan at anywhere near the funding level of the Joint Plan or one that compromised their rights to hundreds of millions of dollars of insurance proceeds. (Proponents' Ex. 70, ¶ 18; July 2 Tr. at 36, 44–45 (Gilbert)). Mr. Newman testified that without the Insurance Allocation Agreement, the Debtor would not have been able to fund the Plan and would have to remain in bankruptcy. (July 14 Tr. at 34 (Newman)).

The Court finds that Dow Corning would have been held liable to the non-debtor's claims for contribution and indemnification which would have had an impact on the size of the estate in bankruptcy. The Shareholders and the subsidiaries and affiliates' claims for contribution would have diminished the size of the estate as well as the Debtor's ability to resolve its liabilities and proceed with reorganization. Without the Insurance Allocation Agreement and the settlements with the Settling Insurers, the Debtor would not have had sufficient funds to finance the Joint Plan. No evidence has been presented to show that the Debtor alone could finance the Joint Plan. To the contrary, any litigation

against the Debtor's Shareholders, subsidiaries and affiliates, and the Settling Insurers would greatly impact the Debtor's estate by decreasing funds from the estate for those entities' defense of the claims against them. The injunction and release provisions are essential to the Joint Plan and to both the consenting and non-consenting creditors.

### 4. Factor Four/Whether the Class or Classes Impacted has/have voted to overwhelmingly to accept the Plan

On remand, the parties opposing the Joint Plan are tort claimants, specifically in Classes 5 (Domestic Breast Implant Claimants) and 9 (Claimant Karen Hustead). There is no dispute that more than 300,000 claimants, 94.1% of those who voted in the tort classes, accepted the Joint Plan. (Proponents' Ex. 13). The following classes accepted the Joint Plan at the close of the balloting: Class 5; Class 6.1; Classes 6A, 6B, 6C and 6D; Class 7; Class 8; Class 9; Classes 10.1 and 10.2; Class 11; Class 12; Class 13; Class 14; Class 14A; Class 16; Class 17; Class 20; and Class 24. Class 19 (LTCI other claims) and Class 21 (subordinated claims) claimants were not eligible to vote. (Proponents' Ex. 13).

Initially, Class 4A (Prepetition judgment claimants) was a rejecting class but, on July 26, 1999, the Bankruptcy Court entered an Order Authorizing Withdrawal of Vote, which allowed a unanimous acceptance by Class 4A. The Foreign Claimants in Class 6.2 also initially rejected the Joint Plan. On July 28, 1999, the Bankruptcy Court entered an Order on Motion of Certain Foreign Claimants to Change Their Rejecting Ballots to Acceptances which resulted in Class 6.2 as an accepting class. As noted previously, although Class 15, the Government Claims, was a rejecting class,

the parties have now entered into a settlement and Class 15 is no longer opposing the Joint Plan.

The arguments by the Nevada Class 5 Claimants, the Texas Class 5 Claimants, the Pennsylvania Class 5 Claimants, the Pennsylvania Class 5 Claimants, Ms. Jacobs, Ms. Schroeder and Ms. Shishido relate to the Class 5 category. Specifically, as to Class 5, the domestic breast implant claimants, 95.5% of the voting class accepted the Joint Plan. (Proponents' Ex. 13). The Australian claimants are categorized under Class 6.1, foreign breast implant claimants (Categories 1 and 2), which had a 78.9% acceptance rate. (*Id.*) Ms. Hustead, is a claimant in Class 9, the domestic other products claimants. In Class 9, 97.9% of those who voted accepted the Joint Plan. (*Id.*) As noted by the Proponents, 94.1% of the combined personal injury tort claimants accepted the Joint Plan. The accuracy of the ballots was not contested at the Confirmation Hearing and no evidence to rebut the results has been submitted.

The Court finds that the affected classes voted overwhelmingly to accept the Joint Plan.

### 5. Factor Five/Mechanism to Pay for All or Substantially All of the Class/Classes Affected by the Injunction

The Joint Plan provides a mechanism to pay Personal Injury Claimants in two ways. The first is for a Personal Injury Claimant to elect to settle any claims through the Settlement Facility. If the Personal Injury Claimant chooses not to settle, then the Claimant may elect to resolve the claims against the Litigation Facility. (Amended Joint Plan of Reorganization, Art. 5.4; Settlement Facility and Fund Distribution Agreement; Litigation Facility Agreement). Dr. Frederick C. Dunbar[9] and Mr. Jacks testified at the Confirmation Hearing that few claimants are expected to "opt out" of the settlement because of the relative ease with which individuals may raise and establish their claims under the Joint Plan and the increased levels of benefits available under the Plan such as in the case of women without disease but with rupture claims. (June 29 Tr. at 50–57, 59–61, 65–67 (Dunbar); June 30 Tr. at 46 (Dunbar); June 28 Tr. at 143, 161–63, 239–42 (Jacks)). Dr. Dunbar testified that the number claimants who elect to litigate will be significantly less than those who elected to litigate under the RSP. (June 29 Tr. at 66–67 (Dunbar)). Dr. Dunbar determined that the opt-out rate under the Joint Plan would be no greater than 4.7%, compared to the opt-out rate in the Dalkon Shield Claimants' Trust experience of 9.1%. (*Id.* at 50–57, 59–61, 65–67). Dr. Dunbar concluded that his lower percentage opt-out rate under the Joint Plan was based on the enhanced settlement benefits under the Joint Plan. (*Id.*) Dr. Dunbar testified that he had a very high degree of confidence in the results of the analysis as applied to the Dow Corning Plan. (*Id.* at 27). Annex A to the Settlement Facility and Fund Dis-

9. Dr. Dunbar, who has a Ph.D in economics, taught and designed courses in econometrics statistics and mathematical economics for Northeastern University early in his career. Dr. Dunbar was employed with the Charles River Associates firm where he researched economic policy issues during the 1970s. In 1979, he joined the National Economic Research Associates where, in 1983, he became

involved in estimating claims, particularly in product liability cases for corporations. Some of his assignments have included estimating the DES claims for Eli Lily, liability claims for B.F. Goodrich, Sarabond for Dow, future asbestos and fireboard claims and Fen-Phen claims. (June 29 Tr. at pp. 24–25 (Dunbar)).

tribution Agreement sets forth in detail the procedure, the required proofs, the payment options and the schedule for the payments. The Settlement Facility provides for a mechanism to pay for all or substantially all of the classes affected by the injunction if a claimant elects to settle any claim. In addition, there is no obligation to prove causation.

The Litigation Facility Agreement sets forth a comprehensive procedure for claimants who elect to pursue litigation of their claims against the Litigation Facility. The structure of the Litigation Facility is patterned after the American litigation system, preserving the right of a claimant to have a jury trial. Pursuant to the Litigation Facility Agreement, a Special Master is appointed by the Court to ensure that the settlement and litigation of claims are accomplished expeditiously and efficiently. (11/13/00 Case Management Order). Alternative dispute resolution methods are set forth in the Litigation Facility Agreement and Case Management Order. (*Id.;* June 28 Tr. at 145 (Jacks)). The Litigation Facility provides for a mechanism to pay for all of the classes affected by the injunction if a claimant should prevail against the Litigation Facility.

### 6. Factor Six/Whether the Joint Plan will Pay in Full All Claimants, in all Classes, Who Elect not to Settle

The Nevada Class 5 Claimants argue that the Sixth Circuit's Opinion requires that full payment be "guaranteed." A review of the Sixth Circuit's Opinion does not state that full payment be guaranteed.

In its Best–Interest-of–Creditors Opinion, the Bankruptcy Court concluded that based on the evidence presented at the confirmation hearing, the funding of the Litigation Facility was adequate. *Best–Interests Opinion,* 244 B.R. at 730, 731.

Mr. Jacks testified that the $400,000,000.00 NPV funding of the Litigation Facility was adequate to satisfy the non-settling claims in full. (June 28 Tr. at 136–38, 140–43 (Jacks)). Mr. Jacks compared the Joint Plan to the Revised Settlement Program ("RSP") in the MDL 926 case, *In re Silicone Gel Breast Implants Products Liability Litigation* (N.D.Ala.), concluding that the Joint Plan procedures and benefits were generally better than those offered in the RSP. He particularly cited: enhancements to disease and rupture payments; more liberal payments for explants; rupture enhancements; no distinction between current and non-current claimants; payments for increased disability in disease claimants; and expedited payments. (June 28 Tr. at 136–143 (Jacks)). Mr. John C. Thornton, III, a tort lawyer and a witness for the Nevada Class 5 Claimants, testified that his former law firm has recommended that all their clients settle under the Joint Plan. (July 16 Tr. at 58 (Thornton)).

Dr. Dunbar, after a detailed analysis of the adequacy of the funds (June 29 Tr. at 122–23 (Dunbar)), concluded that the aggregate funding committed under the Joint Plan, including the $400 million Litigation Fund, will be sufficient to pay in full the Allowed Personal Injury Claims. (June 29 Tr. at 122–23 (Dunbar)). Dr. Dunbar based his estimates on payments under the RSP in the MDL 926 and the Dalkon Shield Clamant's Trust, both of which he characterized as "market-value" settlements. (*Id.* at 26–27, 49–50, 59–61, 79). The 4.7% opt-out rate under the Joint Plan as noted earlier could be lower, given recent science reports or general litigation delay. (June 29 Tr. at 67–71 (Dunbar)). Dr. Dunbar concluded that approximately 7,513 of the 159,577 breast implant claimants will elect to proceed in the Litigation

Facility. (June 29 Tr. at 28–35, 39, 71–72 (Dunbar))

Based on the experience of the Dalkon Shield Claimants' Trust, Dr. Dunbar testified that most of those who will elect to proceed in the Litigation Facility are those who fail to qualify for a settlement or who qualify only for lower than average settlement benefits. (June 29 Tr. at 89–90 (Dunbar)). Professor Vairo testified that because the Dalkon Shield Trust offered a market-based settlement, the more serious cases elected to settle and that most of the claimants who rejected the Trust's original offers ultimately settled without a trial. (June 30, Tr. at 144–45, 147–49 (Vairo)). Professor Vairo further testified that the market valuation is the key factor and that if settlements are at market value, most of the claimants will elect to settle and not elect to litigate. (*Id.* at 134–37, 146–47 (Vairo)).

Dr. Dunbar testified he used standard and well-accepted statistical methods to determine the amount necessary to resolve all non-settling claims, including the defense costs and costs of the administration of the Litigation Facility based on data from the Dalkon Shield Claimants' Trust experience, and a further analysis between verdict values and the mean settlement value. (June 29 Tr. at 82–93, 106–07, 111–12, 256–61 (Dunbar); Proponents' Ex. 26.7). Using this method, Dr. Dunbar calculated that the aggregate nominal cost of resolving breast implant claims against the Litigation Facility would be $88 million. (June 29 Tr. at 126–27; Proponents' Ex. 26.8). The defense and administrative costs would be about $43 million, for a total of approximately $132 million to resolve all breast implant claims. (June 29 Tr. at 114, 127 (Dunbar); Proponents' Ex. 26.8). The amount to resolve the Other Products Claims litigation, defending physician, children and silicone materials claims, and defending non-settling derivative claims are estimated to be $26 million, which includes defense costs. (June 29 Tr. at 114–21 (Dunbar); Proponents' Ex. 26.8). The Net Present Value ("NPV") of the aggregate $158 million to resolve all non-settling breast implant litigation and other litigation claims which would be attributable to the Litigation Fund is $83 million. (June 29 Tr. at 122, 126–27 (Dunbar); Proponents' Ex. 26.10). Dr. Dunbar concluded that the $83 million NPV of estimated costs to the Litigation Fund is more than $300 million below the $400 million NPV funding of the Litigation Fund under the Joint Plan. (June 29 Tr. at 122).

The Plan Opponents have not submitted sufficient evidence to rebut Dr. Dunbar's estimation that all non-settling claimants in the affected classes will be paid in full. As noted by the Bankruptcy Court, the Nevada Class 5 Claimants' expert, Mr. Thornton, essentially came to the same conclusion as Dr. Dunbar. *Best–Interests Opinion,* 244 B.R. at 731. The Court finds that the Joint Plan will pay in full all claimants, in all classes, who elect not to settle.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that the Plan Proponents have established that the release and injunction provisions under the Amended Joint Plan is appropriate in this bankruptcy action. The Plan Proponents have submitted sufficient evidence to satisfy the "unusual circumstances" test set forth by the Sixth Circuit. Most of the evidence submitted by the Plan Proponents has not been seriously challenged.

IT IS ORDERED that the Plan Proponents' Motion for Issuance of Supplemental Findings of Fact in Support of Plan Confirmation is GRANTED.

IT IS FURTHER ORDERED that the Nevada Class 5 Claimants' Motion to File Reply Brief in Excess of five (5) pages (**Docket No. 26955, 3/19/02**) is GRANTED.

IT IS FURTHER ORDERED that the Plan Proponents' Motion to Strike the Response by Allan S. Levin is DENIED and the alternative Motion to treat the Motion as a Response to the Texas Class V. Claimants' Supplemental Response is GRANTED (**Docket No. 27065, 4/26/02**).

IT IS FURTHER ORDERED that the Plan Proponents' Motion to Strike the Response by Pennsylvania Class Five Claimants is DENIED and the alternative Motion to treat the Motion as a Response to the Pennsylvania Class five Claimants' Supplemental Response is GRANTED (**Docket No. 27066, 4/26/02**).

IT IS FURTHER ORDERED that the Nevada Class 5 Claimants' Motion for Leave to File a Brief in Response to Marti Jacobs and Helen Schroeder's Briefs (**Docket No. 27303, 7/9/02**) is GRANTED.