**In re CORNING, INC. SECURITIES LITIGATION**

No. 92 Civ. 345(TPG).

United States District Court, S.D. New York.

Dec. 22, 2004.

Jeffrey A. Klafter, Bernstein Litiwotz Berger & Grossmann LLP, New York, NY, for plaintiff.

Jeremy Goldman Epstein, Shearman & Sterling LLP, New York, NY, for defendant.

### OPINION

GRIESA, District Judge.

This is a class action brought by purchasers of the stock of Corning, Inc. Plaintiffs allege that defendant Corning, Inc. violated federal securities laws and committed common law fraud by failing to disclose the extent of the potential losses faced by Corning in connection with the manufacture and sale of silicone breast implants by Dow Corning Corp. The latter company is owned by Corning and Dow Chemical Company.

Dow Corning was originally a defendant, but the action was stayed against Dow Corning because of its bankruptcy proceedings, although Dow Corning recently emerged from those proceedings. The complaint also named as defendants certain individual directors and officers of Corning and Dow Corning. The individual defendants were dismissed from the action in the Court's opinion of May 6, 1997. Finally, there was a companion action against Dow Chemical, but that action has been dropped.

Corning now moves for summary judgment. The motion is granted.

### Facts

Plaintiffs are persons who purchased Corning common stock during the period January 14, 1989 through January 13, 1992. They seek to represent themselves and others similarly situated in a class action. Corning is a public company engaged in the manufacture and sale primarily of glass products. During the class period it had over ninety million shares outstanding, which were traded on the New York Stock Exchange.

Dow Corning is owned by Corning and Dow Chemical Company, each holding 50% of Dow Corning's common stock. Dow Corning manufactures and sells primarily silicone-based products. During the class period, Dow Corning manufactured and sold more than 4,500 products. In the overall silicone business of Dow Corning, silicone gel breast implants never consti-

tuted more than 1% of the company's business. During the class period, Dow Corning made a substantial contribution to Corning's net income.

Dow Corning has no publicly traded stock, but did have public debt securities, and thus was subject to federal securities law reporting requirements. Accordingly, it filed with the SEC annual Form 10–Ks and quarterly Form 10–Qs.

The Annual Reports, Form 10–Ks, and Form 10–Qs issued by defendant Corning during the class period January 14, 1989 through January 13, 1991 were as follows:

Annual Report—Fiscal Year Ended 1/1/89 (signed 3/89)

Form 10–K—Fiscal Year Ended 1/1/89 (signed 3/13/89)

Form 10–Q—Quarter Ended 3/26/89 (signed 5/5/89)

Form 10–Q—Quarter Ended 6/18/89 (signed 7/21/89)

Form 10–Q—Quarter Ended 10/8/89 (signed 11/9/89)

Annual Report—Fiscal Year Ended 12/31/89 (signed 1/22/90)

Form 10–K—Fiscal Year ended 12/31/89 (signed 3/12/90)

Form 10–Q—Quarter Ended 3/25/90 (signed 4/25/90)

Form 10–Q—Quarter Ended 6/17/90 (signed 7/20/90)

Form 10–Q—Quarter Ended 10/7/90 (signed 11/9/90)

Annual Report—Fiscal Year Ended 12/30/90 (signed 1/21/91)

Form 10–K—Fiscal Year ended 12/30/90 (signed 3/11/91)

Form 10–Q—Quarter Ended 3/24/91 (signed 4/23/91)

Form 10–Q—Quarter Ended 6/16/91 (signed 7/17/91)

Form 10–Q—Quarter Ended 10/6/91 (signed 11/15/91)

The Annual Report for the fiscal year ended January 1, 1989 said nothing about breast implant litigation or claims or litigation in general. It did, however, contain the following statement about Dow Corning's sales and its contribution to Corning:

> Dow Corning's sales increased 13% in 1988 following 20% increases in 1987 and 1986. Corning's share of earnings increased to $73.2 million from $65.7 million in 1987 and $52 million in 1986.

Corning's Form 10–K for the same period contained this same language. In addition, the Form 10–K, in Item 3, headed "Legal Proceedings," stated:

> There are no pending legal proceedings to which Corning or any of its subsidiaries is a party or of which any of their property is the subject which are material in relation to the consolidated financial statements.

Corning's Form 10–Q for the quarter ended March 26, 1989 contained nothing about breast implant litigation or claims or litigation in general, but attached to it was Dow Corning's Form 10–Q for the quarter ended March 31, 1989, which stated in Item 1, headed "Legal Proceedings":

> There are no material legal proceedings pending, other than ordinary routine litigation incidental to its business, to which the registrant or any of its subsidiaries has become a party or of which any of their property is subject.

The Corning Form 10–Qs for the second quarter ended June 18, 1989 and October 8, 1989 contained nothing about litigation. The court has not been furnished with the Dow Corning Form 10–Qs for these quarters, but it will be assumed that they contained the same disclaimer quoted above from the Dow Corning Form 10–Q for the quarter ended March 31, 1989.

Corning's Annual Report for the fiscal year ended December 31, 1989 had nothing about breast implant litigation or claims or litigation in general. However, there were the following statements about Dow Corning:

> Dow Corning's sales and earnings have increased in each of the past three years as a result of continued worldwide demand for silicone-based products and tight cost control.
>
> \*    \*    \*    \*    \*    \*
>
> Dow Corning is expected to lead the growth in sales and earnings of equity companies in this segment.

The Corning Form 10–K for the fiscal year ended December 31, 1989 contained a disclaimer regarding legal proceedings identical to the one in the Form 10–K for the fiscal year ended January 1, 1989.

The Corning and Dow Corning Form 10–Qs for the quarters ended March 25, 1990, June 17, 1990, and October 7, 1990 were the same in respect to the relevant subjects as the Corning and Dow Corning Form 10–Qs for the first quarter of 1989, described above.

The Corning Annual Report for the fiscal year ended December 30, 1990 had nothing about breast implant litigation or claims or litigation in general. The Corning Form 10–K for the fiscal year ended December 30, 1990 had the same disclaimer regarding legal proceedings as was contained in the Form 10–K for the fiscal year ended January 1, 1989.

The Corning and Dow Corning Form 10–Qs for the quarters ended March 24, 1991, June 16, 1991, and October 6, 1991 were the same in respect to the relevant subjects as the Corning and Dow Corning Form 10–Q for the first quarter of 1989, described above.

As will be discussed in greater detail, the crux of plaintiffs' claim is that Corning, in the above-described filings, failed to disclose material information known to Corning regarding Dow Corning's potential litigation liability from silicone breast implants. Plaintiffs claim that by the time of the class period Dow Corning's potential liability was $1 billion, which should have resulted in a $1 billion charge to Dow Corning's earnings. Plaintiffs contend that Corning, as half owner of Dow Corning, should have disclosed the $1 billion problem of Dow Corning, and should have recorded the effect on its own financial position, which would have caused Corning to record losses instead of profits.

*Claims and their Disposition*

Dow Corning entered the breast implant market in 1964. By 1980, lawsuits were being filed against Dow Corning by women who alleged that they had been injured by defective Dow Corning silicone breast implants. Also, claims were made against Dow Corning which did not result in lawsuits.

During the years 1980–1991 five breast implant lawsuits against Dow Corning were tried to conclusion. Three of these resulted in defense verdicts, and two resulted in verdicts for the plaintiffs.

| Year | Plaintiff | State | Result |
|------|-----------|-------|--------|
| 1983 | Klein | New York | Defense Verdict |
| 1983 | Forbes | Arkansas | Defense Verdict |
| 1984 | Stern | California | $1,711,000 Plaintiff's Verdict |
| 1986 | Chandler | Texas | Defense Verdict |
| 1991 | Hopkins | California | $7.3 million Plaintiff's Verdict |

The *Stern* verdict awarded $211,000 in compensatory damages and $1.5 million in punitive damages. The *Hopkins* verdict awarded $800,000 in compensatory damages and $6.5 million in punitive damages. The *Hopkins* verdict was in December 1991 at almost the end of the class period

and after the last of the reports complained of had been filed. Both the *Stern* and *Hopkins* cases were tried in the federal court in San Francisco. Both cases will be discussed in more detail later in the opinion.

It should be noted that when Dow Corning breast implants were sold, they were accompanied by product inserts. The product inserts which have been provided to the court are from the years 1972, 1973, 1985 and 1988. These inserts are of substantial length and consist largely of detailed instructions for use. However, they also included warnings of possible adverse reactions. The warnings in the 1972 and 1973 inserts consisted of a single paragraph, stated in somewhat general terms. However, the inserts of 1985 and 1988 (obviously after the *Stern* verdict) had detailed lists of possible complications—18 in the 1985 insert and 16 in the 1988 insert.

Set forth below are tables regarding the number of claims made in various years regarding Dow Corning breast implants and data about the disposition of such claims. In these tables the year 1984 will be marked with the symbol * and the years 1989, 1990 and 1991 will be marked with the symbol * *. The reason for marking 1984 is that, as noted above, this was the year of the *Stern* verdict. Plaintiffs argue that the *Stern* verdict was significant in indicating the threat of massive breast implant litigation. Thus it is of interest to see what occurred after 1984 in terms of the volume of claims and the amounts needed to dispose of claims. The years 1989, 1990 and 1991 are marked because the class period was June 14, 1989 through January 13, 1992. Thus about half of 1989 was in the class period plus the full years 1990 and 1991. Only a few days of 1992 were in the class period.

The number of plaintiffs suing Dow Corning were:

| Year | Plaintiff Count |
|------|-----------------|
| 1980 | 13 |
| 1981 | 10 |
| 1982 | 20 |
| 1983 | 27 |
| 1984 | 22* |
| 1985 | 39 |
| 1986 | 25 |
| 1987 | 14 |
| 1988 | 14 |
| 1989 | 17* * |
| 1990 | 15* * |
| 1991 | 238* * |
| | — |
| | 454 |

Corning has presented quarterly figures for lawsuits filed in 1991.

| Quarter | Number |
|---------|--------|
| 1st | 7 |
| 2nd | 38 |
| 3rd | 46 |
| 4th | 93 |
| | 184 |

This total is different from the 238 shown in the list of annual figures. The 238 refers to the number of plaintiffs, whereas the 184 refers to the number of lawsuits.

The number of claimants making non-litigation claims against Dow Corning were:

| Year | Claimant Count |
|------|----------------|
| 1980 | 22 |
| 1981 | 25 |
| 1982 | 29 |
| 1983 | 89 |
| 1984 | 70* |
| 1985 | 133 |
| 1986 | 130 |
| 1987 | 121 |
| 1988 | 162 |
| 1989 | 107* * |
| 1990 | 115* * |
| 1991 | 259* * |
| | — |
| | 1262 |

The dollar amounts involved in the settlement of lawsuits are shown in the following table:

| Year | Lawsuit Settlements | Total Amounts for Lawsuit Settlements | Average Lawsuit Settlement Amount |
|------|------|------|------|
| 1980 | 7 | $ 109,750 | $15,679 |
| 1981 | 9 | 46,000 | 5,111 |
| 1982 | 6 | 29,750 | 4,958 |
| 1983 | 10 | 70,000 | 7,000 |
| 1984 | 24 | 1,955,798 | 81,492* |
| 1985 | 27 | 320,203 | 11,859 |
| 1986 | 21 | 771,600 | 36,743 |
| 1987 | 25 | 653,250 | 26,130 |
| 1988 | 21 | 571,750 | 27,226 |
| 1989 | 19 | 433,031 | 22,791** |
| 1990 | 12 | 771,500 | 64,292** |
| 1991 | 11 | 271,350 | 24,688** |

The $1,995,798 figure for settlements in 1984 includes the *Stern* case. As described earlier, there was a jury verdict for $1,711,000, and the case was subsequently settled for this amount. Excluding the *Stern* figure, the amount for settlements in 1984 was $244,789 and the average was $10,643. It appears that the $1,711,000 settlement amount in the *Stern* case was not actually paid until early 1997. However, the payment related, of course, to the *Stern* verdict of 1984, and the amount of that verdict ($1,711,000) was public knowledge in 1984. Consequently it is of interest to observe what occurred in breast implant claims in the period after the *Stern* verdict, and to see the significance of what occurred it is reasonable to include the $1,711,000 figure in the amount for 1984.

The above tabulation does not include the amount of the *Hopkins* verdict. As described, it was rendered in December 1991, shortly before the end of the class period. The Dow Corning Form 10-K for 1991, dated January 16, 1992, states that post-trial motions in *Hopkins* were pending. The record before this Court does not show how the *Hopkins* case was ultimately disposed of.

The table below contains the relevant figures regarding settlement of non-litigation claims

| Year | Claim Settlements | Total Claim Settlements | Average Claim Settlement Amount |
|------|------|------|------|
| 1980 | 7 | $ 16,701 | $2,386 |
| 1981 | 13 | 23,669 | 1,821 |
| 1982 | 36 | 43,641 | 1,212 |
| 1983 | 34 | 45,512 | 1,339 |
| 1984 | 39 | 106,233 | 2,724* |
| 1985 | 55 | 101,862 | 1,854 |
| 1986 | 90 | 215,260 | 2,392 |
| 1987 | 75 | 222,011 | 2,960 |
| 1988 | 105 | 175,553 | 1,678 |
| 1989 | 77 | 346,516 | 4,500** |
| 1990 | 50 | 136,034 | 2,721** |
| 1991 | 65 | 253,572 | 3,901** |

The following shows the total of settlements of both lawsuits and non-litigation claims:

| Year | Total |
|------|------|
| 1980 | $ 126,451 |
| 1981 | 69,669 |
| 1982 | 73,391 |
| 1983 | 115,512 |
| 1984 | 2,062,031* |
| 1985 | 422,065 |
| 1986 | 986,960 |
| 1987 | 875,261 |
| 1988 | 747,303 |
| 1989 | 779,547** |
| 1990 | 907,534** |
| 1991 | 524,922** |

The record on the present motion contains an internal report of Dow Corning relating to product liability litigation (obviously including breast implant cases) as of August 1990. It shows that Dow Corning set up reserves against such litigation. These reserves were approved by Dow Corning's auditors. The following table contains the amounts of the reserves.

| Year | Amount |
|------|------|
| 1985 | $2,938,000 |
| 1986 | 4,238,000 |
| 1987 | 4,111,000 |
| 1988 | 3,788,000 |
| 1989 | 3,347,000 |
| As of 8/90 | 3,253,000 |

Presumably these reserves were taken into account in an appropriate manner in the financial statements of Dow Corning, and were reflected in the share of earnings apportioned to Corning.

As described earlier, plaintiffs argue that Dow Corning at some point (at least by the beginning of the class period) should have charged $1 billion against

earnings and presumably this would have affected Corning's earnings by $500 million to reflect its 50% share. Thus, it is of interest to show the actual costs of disposing of claims during the relevant years, as a percentage of the net income of Dow Corning. In the case of Corning, the data shown takes into account that the reduction of Corning's earnings would be only 50% of Dow Corning's disposition costs. Thus for Corning, the percentage table shows the relation of Corning's one-half share of the disposition costs to Corning's net income.

Before presenting the percentage table, the figures for the net income of Dow Corning and Corning need to be set forth.

Net Income (in millions)

| Year | Dow Corning | Corning |
|------|-------------|---------|
| 1980 | $ 73.9 | $120.5 |
| 1981 | 75.9 | 103.7 |
| 1982 | 52.7 | 74.5 |
| 1983 | 68.4 | 92.2 |
| 1984 | 91.3 | 100.3 |
| 1985 | 95.2 | 133.3 |
| 1986 | 110.6 | 177.1 |
| 1987 | 135.0 | 207.5 |
| 1988 | 150.5 | 210.7 |
| 1989 | 162.8 | 261.0 |
| 1990 | 171.1 | 292.0 |
| 1991 | 152.9 | 316.8 |

The following table shows claim disposition costs as a percentage of net income for both Dow Corning and Corning, calculated as described above:

| Year | Dow Corning | Corning |
|------|-------------|---------|
| 1980 | 2/10% | 5/100% |
| 1981 | 9/100% | 3/100% |
| 1982 | 1/10% | 5/100% |
| 1983 | 2/10% | 6/100% |
| 1984 | 2% | 1%* |
| 1985 | 4/10% | 2/10% |
| 1986 | 9/10% | 3/10% |
| 1987 | 6/10% | 2/10% |
| 1988 | 5/10% | 18/100% |
| 1989 | 5/10% | 15/100%** |
| 1990 | 5/10% | 15/100%** |
| 1991 | 3/10% | 8/100** |

Since plaintiffs in the present action lay considerable stress on the *Stern* case, a description of that case is necessary. On November 4, 1984 a federal jury in San Francisco found Dow Corning liable in a suit brought by Maria Stern alleging that her silicone breast implants had ruptured, causing a variety of severe immunologic reactions and other medical complications. The jury found for plaintiff on each of the following theories: (1) strict liability for design defect; (2) strict liability for manufacturing defect; (3) breach of express warranty; (4) breach of implied warranty; and (5) fraud. The jury awarded Ms. Stern $211,000 in compensatory damages and $1.5 million in punitive damages. In a June 13, 1985 Memorandum Decision and Order, Judge Patel denied defendant's motion for a new trial. The judge also denied the motion for JNOV on all grounds except the issue of strict liability for manufacturing defect. *Maria Stern v. Dow Corning Corporation, et al.*, No. C–83–2348–MHP at 9 (N.D.Cal.1985). Judge Patel wrote a lengthy decision finding, among other things, that there was substantial evidence to support the jury verdict as to fraud and punitive damages, because there was evidence of Dow Corning's knowledge of the inadequacy of its testing and knowledge of rupture and gel bleed, together with willful failure to inform the consumer. Following the *Stern* verdict, and during the pendency of an appeal by Dow Corning, a settlement was reached in the case. This was in May 1997. The settlement was for the amount of the verdict—$1,711.000. The settlement agreement provided, in part, that a protective order would seal documents and trial transcripts.

The *Stern* verdict was reported in at least two publications. On November 7, 1984 the *Wall Street Journal* ran a story on the case. It contained the following description of the evidence at trial:

Evidence was presented at the trial that the silicone gel leaked into [Stern's] body from the 1978 implants, which were found to be ruptured when removed in 1981.... In addition to finding the implants were defectively designed and manufactured, the jury also found that there had been a breach of implied and expressed warranty and fraud.

The *Stern* verdict was also reported in a September 9, 1985 publication of *Personal Injury Verdict Reviews*, apparently a trade publication of the personal injury bar. The case was described as follows:

P's theories of liability included strict liability for mfg. and design defects, breach of warranties and fraudulent misrepresentation, concealment and failure to disclose material information. P claimed that D knew through its own tests that silicone gel would cause cellular immune response in humans; that implant could spontaneously rupture and that such ruptures could remain undetected, allowing gel to migrate to distant sites; that D withheld above information from physicians and patients; that D misrepresented safety of implants and silicone gel in package inserts and product literature; and that D failed to adequately test implants for safety and biocompatibility. Documents gathered during discovery supported P's claim for punitive damages.

Litigation against Dow Corning concerning silicone breast implants was a regular topic at Dow Corning board of directors meetings at least as early as 1984. The minutes of the December 7, 1984 Dow Corning board of directors meeting reflect that the *Stern* case was addressed at that meeting. Vice President, Secretary, and General Counsel of Dow Corning, J.R. Jenkins, reported to the board that the jury in the *Stern* case had awarded $211,000 in compensatory damages and $1.5 million in punitive damages. Jenkins reported that post-verdict motions had been made. Jenkins testified in his deposition that the Dow Corning board would have been informed later of the post-verdict settlement of *Stern*, including the protective order provision.

The minutes state that R.T. Rylee, General Manager of the Health Care Business for Dow Corning, commented on the business implications of the *Stern* case at the December 7, 1984 meeting, and "also remarked that the medical profession and vast majority of patients wholeheartedly support [silicone breast implants] as offering substantial therapeutic benefits, particularly for reconstructive surgery." The minutes state that a "discussion took place on the implications of the case," but do not set forth the contents of that discussion. Rylee testified at his deposition as to the content of his remarks to the Dow Corning board regarding the *Stern* verdict.

I explained that I thought it was an unusual case, that the basic allegations were simply not correct, that there was no science to support those claims, that in fact the science was supportive of our position that silicone is not and could not be a human adjuvant; therefore, I did not think that there would be more cases like that. I recognized that one judgment is sometimes detrimental, but I felt comfortable that our science would prevail if there are more cases brought; that the Stern case involved a very sympathetic plaintiff and that the verdict was more of an emotional verdict rather than a true verdict based upon the facts.

Rylee also testified that he did not recall anybody at the meeting expressing a different view concerning the *Stern* verdict.

Likewise, in the September 6, 1985 Dow Corning board meeting, Jenkins informed the board that since the last meeting 23 new lawsuits had been filed, with Health Care accounting for 17 of them. The predominant Health Care claim was rupture of the mammary prosthesis. He then informed the Board of three new cases where the plaintiffs' attorneys had used identical pleadings and interrogatories as were used in the *Stern* case. Finally, Jenkins notified the Board that Judge Patel had denied their motion for new trial and JNOV, but had dismissed the claim of a manufacturing defect.

The record also contains testimony from Corning officers who were members of the Dow Corning board, stating that during the early 1980s, and throughout the class period, they were consistently assured by Dow Corning representatives that silicone breast implants were safe. James R. Houghton, Corning's Chief Executive Officer and a Dow Corning director, testified that he was told "[m]any times over the years" that the implants were safe, and that "Dow Corning has always maintained these products are safe." Van C. Campbell, Corning's Chief Financial Officer and Vice Chairman, and also a Dow Corning director, testified that presentations to the Dow Corning board were that silicones "were about the safest material for the human body that existed anywhere. Bottom line, totally inert, didn't react with the body. That's what made it a great material for health care applications, and it is what made them very comfortable and confident about silicones." William C. Ughetta, Corning's general counsel, testified that he was "consistently advised by Dow Corning's management that the product was safe."

At the Dow Corning board meeting of June 12, 1987 Jenkins reported certain figures about numbers of lawsuits filed per month and numbers of settlements. He did not explicitly state whether he was referring to breast implant cases or products liability cases in general, but the figures are roughly consistent with the figures given in the tables set forth earlier in this opinion. Jenkins did refer to the settlement of a case, called the *Hopson* case, in which Dow Corning contributed $25,000. The company had supplied materials to another manufacturer of implants.

Jenkins also referred to a program (called the "geltox study") for testing of the silicone gel used in breast and other implants. Dow Corning had empaneled seven of the world's leading experts, whose work included reviewing previous Dow Corning studies. While recommending that still further tests be carried out, the panel concluded that fibrosarcomas in rats was caused by a factor specific to rodents and was not an indication of significant risk to human health. The panel also concluded that certain prior reports regarding malignant lymphoma were erroneous. The summary report of the panel was to be communicated to the FDA.

At the Dow Corning board meeting of December 9, 1988 Jenkins reported further on the geltox study, stating that the expert panel had confirmed its preliminary position of 1987. However, Jenkins reported that a Dr. Sidney Wolfe had obtained access to certain Dow Corning data and FDA internal memoranda and had apparently released certain selective data to the press, resulting in extensive press coverage of possible disease causation, contrary to the actual expert conclusions. Dr. Wolfe had petitioned the FDA to ban implant sales, but the FDA had refused to do so.

However, on November 16, 1988 James Houghton of Corning conferred with L.A. Reed, president of Dow Corning, who said he was considering the possibility of Dow

Corning withdrawing from the medical device business (which included breast implants), "not just because of the recent uproar over mammary prostheses, but in general problems could get worse in the future."

*Regulation and Further Developments*

When Dow Corning began marketing silicone breast implants in 1975, the Food and Drug Administration ("FDA") had no jurisdiction over medical devices such as breast implants, and no FDA approval was required prior to marketing such devices. In 1976 Congress passed legislation that gave the FDA jurisdiction over "medical devices," which term encompassed silicone breast implants. The legislation established three classes of devices—Class I, Class II, and Class III, each subject to increasingly strict regulatory requirements—and required the FDA to take steps to classify all medical devices into one of these classes.

On January 19, 1982 the FDA published notice of its proposed classification of silicone breast implants as Class III devices, the most stringent medical device classification. The decision of the FDA was made in spite of an advisory panel recommendation that silicone implants be classified as Class II, a less stringent category. Class III status required that silicone breast implant manufacturers submit to the FDA premarket approval applications ("PMAAs") demonstrating the safety and effectiveness of the implants. The FDA's notice of proposed classification stated in relevant part:

> The agency believes that premarket approval is necessary for this device because it presents a potential unreasonable risk of injury due to (1) possible migration of silicone gel from the interior of the prosthesis to adjacent tissue ... (2) contraction of the fibrous tissue capsule ... which also can

lead to marked asymmetry in breast contour, hardness and pain, and (3) possible long-term toxic effects of the silicone polymers from which the prostheses are fabricated.

The actual classification did not occur until 1988.

On June 24, 1988 the FDA published its final rule classifying silicone breast implants as Class III devices. As a result, implant manufacturers, including Dow Corning, were required to submit PMAAs demonstrating the safety and effectiveness of the devices. Dow Corning had thirty months in which to submit its PMAA.

The minutes of the September 9, 1988 Dow Corning board meeting contain a report from Jenkins regarding the FDA's move to classify silicone breast implants as Class III devices. Jenkins stated that Dow Corning had thirty months in which to provide the FDA with "studies to support the safety of the mammary implant." At the same meeting, Jenkins also reported to the board on a settlement in the *Howell* case, which was, according to the minutes, a case alleging an immunologic reaction to silicone breast implants. Jenkins reported to the board that "[t]he details of the settlement will be protected by court order which will also require that plaintiff's counsel return all documents to Dow Corning."

In December 1988 the lawyer who represented the plaintiff in the *Stern* case filed another breast implant case against Dow Corning—the *Hopkins* case, about which more will be said later in this opinion.

At a Dow Corning board meeting on September 15, 1989 Jenkins reported that health care litigation, and in particular breast implant-related litigation, had increased over the previous year:

[W]hile total pending Health Care lawsuits are down from this time last year, the filing rate for new cases is up at 4.5/month versus 3.2/month in 1988. Health Care claims are also up at 110 August YTD versus 64 for the same period in 1988. These are mostly mammary implant cases as a result of the extensive publicity at the end of 1988. There were 16 mammary lawsuits filed August YTD versus 10 for all of 1988.[1] Fortunately cases are being resolved at a pace which is reflected in the overall lower total of pending Health Care cases. Mr. Jenkins also commented that "The Silicone Breast Implants" are now an official target group for members of the plaintiffs bar group, The Association of Trial Lawyers of America.

Another meeting of the Dow Corning board occurred on June 22, 1990. Jenkins's litigation report noted that "case totals versus last year reflect both a higher filing rate ... and a higher resolution rate. ... Overall, we continue to see more filings related to the mammary prosthesis and orthopedic knees than other product lines."

In November 1990 a federal judge ruled in a Freedom of Information Act case, Teich v. FDA, 751 F.Supp. 243 (D.D.C. 1990), that the advocacy group Public Citizen was entitled to the release, by the FDA, of results from Dow Corning animal tests of silicone breast implants.

On December 10, 1990 television news reporter Connie Chung hosted a nationally televised program on the breast implant controversy titled, "Breast Implants: Dangerous Devices?"

On December 18, 1990 the Human Resources and Intergovernmental Relations Subcommittee of the Committee on Governmental Operations of the House of Representatives commenced a hearing on the subject, "Protecting Patients From the Dangers of Silicone Breast Implants." Representative Ted Weiss was chairman of the subcommittee. On that day various witnesses testified, including two women who had unfavorable experiences with such implants and, in the words of Chairman Weiss, "one of the many women who have undergone implant surgery without serious complications." Chairman Weiss stated:

I think that all reasonable people can agree that more research can help us find out if some implants are safer than others, and if some implants should be prohibited. In the meantime, potential patients need to be well informed of the risks of implants, and the FDA needs to make sure that consumers are protected.

On December 14, 1990 the Dow Corning board met, and heard the following from Jenkins.

Of special note was that media attention on the mammary implant was once again at an all-time high with a television special by Connie Chung ... on the heels of news articles about District Court Judge Sporkin's opinion in the Teich case, and now a Congressional Committee request for Dow Corning's testimony at a Hearing on December 18.

.... The purpose of the hearing is to investigate the regulation and classification of the mammary implant by the FDA.

We are expecting continuing interest in the mammary implants over the up-

---

1. This refers to the number of lawsuits, not the number of plaintiffs (14) used in a table

earlier in the opinion.

coming months and years. Some of the continuing issues will be (1) Those surrounding the continuing appeal of the *Teich* case (Stay granted by Judge Sporkin pending appeal). (2) Continuing controversy regarding the safety of mammary implants including adverse media coverage and lawsuits. (3) The continuing debate over the public right to know versus the corporate right to maintain confidentiality of information of commercial value.

Another issue will surround protective orders, and Dow Corning's right to have trade secret and other proprietary matters contained in its internal memoranda remain as private property during and after Congressional review rather than being transformed into public information during the process.

On June 10, 1991 an article ran in *Business Week* titled, "Breast Implants: What Did the Industry Know, and When?" The article reported negatively upon issues concerning silicone breast implants. The article discussed concerns about safety, mentioned pending litigation, and referred to an ongoing FDA review of the implants.

At the June 10, 1991 Dow Corning board meeting there was another report from Jenkins.

> Mr. Jenkins commented that the filing rate for new lawsuits was double the rate this time in 1990 (nearly 8 cases a month). This was fueled by mammary implant litigation filings which had already eclipsed the 1990 full year totals (17 new filings) and were showing no signs of letting up.

> Mr. Jenkins noted that the negative articles concerning the mammary implant were continuing as part of a well-orchestrated effort by the plaintiff's bar. He noted that Dow Corning is stepping up its efforts as well, including improved communications with the media and employees.

The board was told about stepped-up public relations measures by Dow Corning, including the establishment of a breast implant safety hotline. The board also discussed the Congressional inquiry into breast implant safety, and specifically addressed efforts by Congressman Ted Weiss to gain access to Dow Corning internal records regarding breast implant safety.

> Mr. Jenkins commented that Dow Corning was implementing an Information Center featuring an 800 number to respond to the real need that women have for more information. . . .

> Mr. Jenkins commented that we are still cooperating with Congressman Weiss in order not to receive a Congressional subpoena. Congressman Weiss' office had been told that we would be releasing more information to his office after the July 8 Pre–Market Approval Application filing date.

Notes from the diary of James Houghton included Houghton's impressions of the June 10, 1991 Dow Corning board meeting. Houghton wrote:

> In office in AM—to Dow Corning for Board. All serene on surface except for D–C "mushy" outlook. Real issue is managing implant dispute. Could this turn into another asbestos? D–C seems to be convinced "Right is on their side." (Doctor, medical evidence, etc.) But jury trials are rough. This could be a pain in the ass for a long time. D–C is *right* but that's not the issue with trial lawyers and juries.

In July 1991 Dow Corning filed a PMAA for silicone breast implants with the FDA, as it was required to do under current regulations.

On July 17, 1991 Dow Corning announced that it was releasing publicly 10,000 pages of research reports about silicone breast implants, based on studies conducted over a 30–year period. Dow Corning issued a press release on the same day, which stated in part

> We recognize that there is a public concern about the safety of breast implants, and we believe this information will help alleviate those concerns. We are taking this unprecedented action because some critics have persisted in equating our interest in protecting trade secrets with a desire to conceal findings that show implants are harmful to women. We simply cannot allow this mischaracterization of the studies to continue, . . .

Also released that day was a five-page summary of the research, and eleven pages of supplementary technical material about breast implants which included a section entitled "Benefits and Potential Complications of Silicone Breast Implants." This section referred to a national survey showing that 92 percent of American women having breast implants said that they were satisfied. The materials conveyed the view that complications were the exception and that, in general, the breast implants were safe. The positive results of the 30 years of tests were cited to back this up. Also, a plan for certain further tests was announced. The description went on to state that no type of surgery, including breast implantation, is risk-free. Certain possible adverse complications were described, including rupture and implant gel bleeding. However, a discussion of breast cancer concluded that, to date, no studies had found an association between cancer and breast implants and the same conclusion was set forth regarding connective tissue disease, including human adjuvant disease (HAD). A form letter to consumers had been prepared announcing that Dow Corning was making available the 10,000 pages and that an Implant Information Center was being established.

The minutes of the September 27, 1991 Dow Corning board meeting refer to a report by Jenkins that breast implant lawsuits were "being filed at a rate of 9 per month, which is more than three times last year's rate." Jenkins also reported that "resolutions of cases for nuisance values are becoming more and more difficult in light of the continuing public attention concerning these implants."

Houghton's diary notes contain an entry pertaining to the September 27 board meeting. Houghton wrote:

> Dow Corning meeting. Breast implant issue does not sound good. FDA is playing hard ball. No medical evidence of problems but Ted Weiss committee in Congress putting the heat to them. No good solution. Lawsuits will come regardless of whether we stay in or get out.

On November 13, 1991 an FDA advisory panel reviewing Dow Corning's PMAA for silicone breast implants determined that the implants would not be approved at that time, but could remain on the market pending further investigation into the safety of the product. Dow Corning was obligated to submit further data to the FDA. Lawrence Reed, President and CEO of Dow Corning, testified at his deposition regarding the November action by the FDA advisory committee, stating that it was surprising and unanticipated:

> That seemed like a compromise that—it made some sense, but it wasn't an anticipated item from that panel, per se. Their charge as a panel, per se, I think was to either approve or disapprove and they came out with a hybrid which was not really my understanding of their

specific charter, so in that context, I believe it was surprising.

On December 4, 1991 two of Dow Corning's senior officials, Gary Anderson and Ed Steinhoff, made a presentation to the Corning board of directors that summarized the overall state of Dow Corning's business, and in particular the current situation with silicone breast implants.

You have also undoubtedly read articles and seen TV reports that challenge the safety of silicone-filled mammary implants. Some critics want the FDA to take the implants off the market. We were pleased when an FDA advisory panel recommended just a few weeks ago, that the implants be allowed to stay on the market. Additional studies ... which we support ... were called for in the panel's recommendation. We expect the FDA's ruling no later than early January.

Whatever the agency's decision, I want to assure you of our deep and long-held conviction, that we are providing a safe product, that meets the physical and psychological needs of millions of women.

\* \* \* \* \* \*

Silicones continue to be the material of choice for scores of medical devices, because of their bio compatibility within the human body. We have launched a communications program to increase the public's awareness of these, and other uses of silicones.

William C. Ughetta, Corning's General Counsel, testified at his deposition regarding the nature of Anderson's and Steinhoff's presentation to the Corning board on breast implants. Ughetta stated that Anderson conveyed "that the product was safe." Regarding the FDA advisory panel's November 1991 deferral of approval for the implants, Ughetta testified that "Dow Corning management couched it in terms that after the hearing, the advisory panel concluded that the product could stay on the market ... that it was an ongoing process with the panel and the panel had decided not to recommend the withdrawal of the product."

On December 10, 1991 a federal jury in California returned a verdict against Dow Corning in the *Hopkins* case, brought by a plaintiff claiming that she was injured as a result of receiving silicone breast implants. The jury found that the breast implants received by the plaintiff were defectively designed and manufactured, that Dow Corning failed to warn plaintiff of medical risks posed by the implants, and that Dow Corning had committed fraud. The plaintiff was awarded $800,000 in compensatory damages and $6.5 million in punitive damages. Reed, in his deposition, testified that he was "surprised" by the *Hopkins* verdict, "[b]ecause progress reports of Dow Corning from counsel suggested that the verdict could actually be a higher percent probability of it being a clear verdict in favor of the company."

On December 13, 1991 the Dow Corning board met. According to the minutes, Jenkins reported the *Hopkins* verdict to the board, and told the board that the decision had rested largely on "the same internal documents that plagued us in the *Stern* case in 1984 involving the same plaintiff's counsel."

On January 6, 1992 FDA Commissioner David Kessler placed a moratorium on the sale of silicone breast implants pending further review of the safety and effectiveness of such devices. On the same day, Dow Corning suspended shipments of its breast implants. The moratorium became effective January 13, 1992, on which day the price of Corning's common stock fell approximately 13.5%, from $79 per share to $68 3/8 per share.

Reed testified in his deposition that he was "shocked" by the moratorium. His testimony was:

Because I had had communications with Dr. Kessler prior to that which in those discussions he seemed to be clearly signaling desire to have the product continue on the market in general commerce, but with the proviso that really Dow Corning would stay in the business and be committed to engaging in additional scientific studies regarding the autoimmune system. The studies, which some of them were already the protocols, were being finalized at places like the University of Michigan. So I was shocked by it.

Reed reported these sentiments to the Corning board at its meeting of February 5, 1992. The minutes state:

Mr. Reed reported that Dow Corning Corporation had been completely surprised by the adverse jury verdict in the *Hopkins* case and by the personal involvement of Dr. Kessler, Chairman of the Food and Drug Administration, in the breast implant matter as the evidence widely reported by the media was primarily anecdotal and not scientific.

*Events Subsequent to the Class Period*

Corning's Form 10–K for 1991, dated March 10, 1992, stated that Dow Corning had been sued in a number of cases involving its breast implant business, and referred to the attached financial statements of Dow Corning, dated January 16, 1992, for details. Note 12 to the Dow Corning financial statements described problems about the breast implants. Much of the discussion was about the FDA moratorium of January 6, 1992 and the possibility that the breast implant business might be permanently discontinued. Note 12 explained that in December 1991 Dow Corning had recorded a $25 million charge against earnings to cover business contingencies arising from the FDA action. This $25 million was not said to relate to liabilities to breast implant purchasers. However, Note 12 went on to describe the *Hopkins* litigation. The note voiced the opinion that, based on historical experience and management's assessment of the merits of pending claims, breast implant claims would not have a material adverse effect on the company's financial position.

At some point in 1992 Dow Corning announced that it would not resume the production or sale of silicone gel breast implants and that it would withdraw its PMAA from consideration by the FDA.

The Dow Corning Form 10–K for 1992 had a lengthy description of the breast implant litigation in Note 2 to the financial statements. This note stated that during 1992 there was a considerable increase in breast implant lawsuits against Dow Corning, and that as of January 11, 1993 approximately 3,600 suits by individuals were pending versus approximately 125 as of December 31, 1991. In addition there were 30 class actions pending as of January 11, 1993.

On June 25, 1992 the Federal Judicial Panel on Multidistrict Litigation ordered the consolidation of all federal court breast implant actions for coordinated pretrial proceedings and transferred these actions to Chief Judge Pointer of the Northern District of Alabama. On September 1, 1994 Judge Pointer certified a class for settlement purposes and approved a global settlement agreement that contemplated the creation of a $4.25 billion fund to cover breast implant claims against Dow Corning as well as other manufacturers. Problems arose with this settlement and it was not carried out.

On May 15, 1995 Dow Corning filed a petition for reorganization under Chapter

11 of the Bankruptcy Code in the Eastern District of Michigan. All lawsuits against Dow Corning were automatically stayed.

The complex litigation history thereafter need not be described. It is sufficient to say that, as a result of various motions, the breast implant litigation came to be centered in the Eastern District of Michigan. *See In re Dow Corning Corporation,* 86 F.3d 482 (6th Cir.1996). Judge Pointer retained a role as the judge in the MDL proceeding dealing with certain pretrial matters.

Pursuant to Rule 706 of the Federal Rules of Evidence, Judge Pointer appointed a group, which he designated as the "National Science Panel," to evaluate the scientific data on breast implants in relation to certain diseases and bodily malfunctions. The Panel commenced its work in October 1996 and rendered its report on November 17, 1998.

The Panel reviewed existing data, including the results of testing which had previously been carried out. This previous testing had been almost entirely chemical tests of various substances and animal tests. Further testing of this kind was carried out under the direction of the Panel. The Panel also arranged for a substantial amount of testing on humans.

The conclusions, reached by the Panel on the basis of its study, can be summarized as follows:

> There is no evidence that silicone breast implants precipitate novel immune responses or induce systemic inflammation. The only reasonably consistent effect of silicone on the immune systems of animals tested is a depression in natural killer cell activity. However, no physiologic consequence of this depression has been demonstrated. Of all the tests that have been used to study silicone effect, the toxicologic and immunologic responses are few in number and questionable in significance.

> Overall, women with silicone breast implants do not display a silicone-induced systemic abnormality in the types or functions of cells of the immune system.

> There was no relationship or association between silicone gel-filled implants and any of the definitive connective tissue disease or the other autoimmune/rheumatic conditions.

> There was no appreciable association with silicone breast implants demonstrated in any relevant connective tissue diseases.

In spite of this report, the large number of breast implant lawsuits remained and needed to be disposed of. The actions against Dow Corning were stayed because of the bankruptcy proceeding, but they were, of course, not terminated. Settlement discussions resumed at some point in the context of working out a plan of reorganization. A complex settlement plan was ultimately arrived at after a lengthy period of negotiation. Among other things, Corning and Dow Chemical helped fund the settlement out of their equity interests in Dow Corning to the extent of $2.35 billion. *See In re Corning Corporation,* 287 B.R. 396 (E.D.Mich.2002). On January 16, 2004 Corning announced that its share of Dow Corning's contribution to the global breast implant settlement would result in a charge to its fourth quarter 1993 earnings of $203 million, or $1.06 per share. The settlement agreement was concluded in June 2004 and this permitted Dow Corning to emerge from bankruptcy.

In the negotiations leading to the settlement, there was considerable emphasis on the fact that Dow Corning, Corning, and Dow Chemical never ceased to vigorously contest the causation issue as it related to

the claim that silicone gel caused disease. At every stage these companies took the position that silicone exposure did not cause any of the diseases claimed by the claimants. However, to be rid of the burden of the litigation, a settlement was agreed to. Under the settlement, women would make claims for adverse physical conditions, but did not need to prove any causal connection with silicone exposure. By the same token, the companies made no admission of such causal connection.

### The Claims In This Case

The principal cause of action in this case is contained in Count I of the complaint and is brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5. This is a class action brought on behalf of all purchasers of Corning common stock between January 14, 1989 and January 13, 1992 inclusive. The commencement of the class period is governed by the statute of limitations applicable to claims under § 10(b). The class period ends on the effective date of the FDA moratorium on the sale of the breast implants.

The complaint notes that the Annual Reports, Form 10–Ks, and Form 10–Qs, issued by Corning, included Dow Corning's financial statements. The complaint alleges that all Dow Corning's annual and quarterly financial statements issued during the class period should have reported a potential liability on breast implant claims of $1 billion and should have recorded a charge to Dow Corning's earnings in the amount of $1 billion to cover potential liability exposure to approximately 800,000 women who had purchased Dow Corning breast implants.

The complaint alleges that Corning should have disclosed the effect of this $1 billion charge against Dow Corning's earnings and thus should have reported significant losses in each of its Annual Reports, Form 10–Ks and Form 10–Qs issued during the class period.

It is alleged in the complaint that Dow Corning had not conducted adequate testing and that there were problems with the safety of the implants, which threatened the $1 billion potential liability, all of which should have been described and disclosed in the financial reports of Corning during the class period, but was not. It is further alleged that Corning was guilty of scienter as to the need for the $1 billion charge to Dow Corning's earnings and the facts showing the potential massive litigation exposure.

Count I is against Corning and certain Corning individual defendants under Section 10(b) and Rule 10b–5. The action has already been dismissed as to the individual defendants, leaving Corning as the sole defendant in Count I.

Count II is against Dow Corning and certain Dow Corning individual defendants under Section 10(b) and Rule 10b–5. The claim against the individual defendants has been dismissed. The action was stayed as to Dow Corning because of its bankruptcy proceedings, although those proceedings were recently concluded.

Count III is against Corning and is brought under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).

Count IV alleges common law fraud.

### Discussion

### I. Section 10(b) Claim

Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C.A. § 78j, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any

facility of any national securities exchange

\*　　\*　　\*　　\*　　\*　　\*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Security Exchange Commission Rule 10b–5, promulgated under Section 10(b) of the 1934 Securities Exchange Act provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ To prevail on a cause of action under Section 10(b) and Rule 10b–5, a plaintiff must prove that the defendant, acting with scienter, made a false material representation or omitted to disclose material information in connection with the purchase or sale of securities. *S.E.C. v. Mon-arch Funding Corp.*, 192 F.3d 295, 308 (2d Cir.1999); *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). Where the plaintiff alleges that the defendant has disseminated false or misleading information into the securities market, and this is information on which a reasonable investor would rely, actual reliance need not be proved, because it is assumed that the market price is influenced by the misrepresentations. It is sufficient that the investor bases his transactions on the market price. *De Marco v. Robertson Stephens, Inc.*, 318 F.Supp.2d 110 (S.D.N.Y.2004); *Chavin v. McKelvey*, 25 F.Supp.2d 231 (S.D.N.Y.1998). This "fraud on the market theory" is a substitute for actual reliance. *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

Under Section 10(b) and Rule 10b–5, a misrepresentation or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *SEC v. First Jersey Secs.*, 101 F.3d 1450, 1466 (2d Cir.1996); *ZVI Trading Corp. Employees' Money Purchase Pension Plan & Trust v. Ross (In re Time Warner Sec. Litig.)*, 9 F.3d 259, 267–68 (2d Cir. 1993). The "total mix" of information may include information "reasonably available" to the plaintiff. *See e.g., United Paperworkers Int'l Union v. International Paper Co.*, 985 F.2d 1190, 1198 (2d Cir.1993). A misrepresentation is material if "a reasonable man would attach importance to the fact misrepresented in determining his course of action." *Wheat v. Hall*, 535 F.2d 874, 876 (5th Cir.1976); *John R. Lewis, Inc. v. Newman*, 446 F.2d 800, 804 (5th Cir.1971). A fact may also be considered

material if there is a "substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares." *See e.g., Basic v. Levinson,* 485 U.S. 224, 241, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir.1994).

In order to prove a § 10(b) claim, a plaintiff must also prove the defendant's scienter. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter has also been defined by the Second Circuit as "conscious misbehavior or recklessness," including where defendants had access to material information that contradicted public statements. *See Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000).

Item 303 of SEC Regulation S–K provides guidance on what should be included in Form 10–Ks and Form 10–Qs. Corning argues that Item 303 does not impose any duty under Rule 10b–5, citing *In re Quintel Entertainment Inc. Securities Litigation,* 72 F.Supp.2d 283, 293 (S.D.N.Y.1999), and *In re Canandaigua Securities Litigation,* 944 F.Supp. 1202, 1209 n. 4 (S.D.N.Y.1996). However, the Second Circuit in a subsequent case reversed a district court's dismissal of a Rule 10b–5 claim that was based on a defendant's failure to make disclosures allegedly required under SK–303. *In re Scholastic Corporation Securities Litigation,* 252 F.3d 63, 74 (2d Cir.2001).

It would appear that the Court must consider Item 303 in connection with plaintiffs' claim under Rule 10b–5. It must be stated that the relevant portions of Item 303 do not really vary from the case law interpreting Rule 10b–5. Paragraph (a) of Item 303 deals with disclosures of facts that "are necessary to an understanding of its financial condition," that "enable the reader to assess material changes in financial condition and results of operations,"

and that "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(1)-(3). SK–303 also provides:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact on future operations.

Plaintiffs refer to a Statement of Financial Accounting Standards No. 5, issued by the Financial Accounting Standards Board, a private organization. This is referred to as FASB 5. It is a 28–page booklet dealing with accounting for contingencies. Not surprisingly, FASB 5 includes pending or threatened litigation as one of several kinds of loss contingencies. Paragraph 8 of FASB 5 provides:

> An estimated loss from a loss contingency ... shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of loss can be reasonably estimated.

Paragraph 10 provides:

> If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

■ The problem with FASB 5 is that it does not, on its face, have any provision relating to materiality, or the size or magnitude of the contingencies. Undoubtedly, such concepts are understood by the accounting profession as necessary for the application of FASB 5. But they are not in the text of the statement. In any event, materiality is an essential element in the application of Rule 10b–5.

■ Considering Rule 10b–5 in conjunction with SK–303 and FASB 5, it is perfectly clear how the law applies to the present case. If at the time the financial statements in question in this action were issued, Corning knew of potential liabilities of its 50%-owned Dow Corning with respect to breast implant lawsuits and non-litigation claims, and knew that these liabilities were potentially of such a size as to materially affect the future earnings of Corning and the general financial condition of Corning, the law required Corning to disclose this. Such a disclosure would undoubtedly have taken the form of a charge against income as well as a description of the circumstances. Failure to make such a disclosure would be failure to state material facts, thus creating liability under Rule 10b–5.

The Court recognizes that scienter can include recklessness as well as actual knowing misrepresentation. But plaintiffs claim here that the latter occurred. There has never been an attempt to develop a case of recklessness.

In connection with the issues presented in this case, the Court is mindful of the decisions which make it clear that hindsight cannot be the basis for liability under the federal securities laws. Putting it another way, defendants are not charged with clairvoyance. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir.1995); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563 (6th Cir.2004); *SEC v. Wellshire Sec., Inc.*, 773 F.Supp. 569, 576 (S.D.N.Y.1991).

Now it is necessary to take the well-established legal rules, and apply them to the facts of this case. In doing so the Court recognizes the strict standards which apply to a motion for summary judgment.

This opinion has referred several times to the claim of plaintiffs about the potential $1 billion liability. The complaint asserts (par. 26) that there was a "potential billion dollar exposure to approximately 800,000 women," and states that Dow Corning's financial statements, included in Corning's 10–K and 10–Q SEC filings, and Annual Reports, "misrepresented Dow Corning's earnings in that they failed to disclose a charge to income of at least $1 billion." The complaint goes on to allege that if there had been proper accounting "Dow Corning and Corning would have reported significant losses during the Class Period, rather than the substantial profits they did report."

Plaintiffs have never been precise as to whether the $1 billion should have been a one-time charge or whether there were

different liability exposures at different times, resulting in different charges. The complaint has no more refined reference than the one figure of $1 billion.

At the oral argument of the motion, held on October 27–28, 2004, plaintiffs' attorney substantially amended this claim, or arguably even withdrew it. She stated that she was not intent on standing on a billion dollar number. The attorney stated that a number considerably less than a billion would still be material (SM 45). But the attorney did not come up with any analysis or even a suggestion of a lesser figure or range of lesser figures.

At the oral argument the Court inquired about the issue of *when* the charge should have been taken. Plaintiffs' attorney stated that there was no obligation to take a charge at the beginning of the class period (SM 71–72), but that other kinds of disclosures should have been made in the reports filed at that juncture. There should have been a disclosure of the kind which occurred on July 17, 1991, when the 10,000 pages of research materials were released (SM 73–76). Also plaintiffs' attorney argued that Dow Corning should have disclosed, early in the class period, what Judge Patel said in her decision in the *Stern* case about the inadequacy of testing (SM 77).

The Court then returned to the subject of a charge against income, and asked if there came a time when there should have been a substantial charge (SM 78). Plaintiffs' attorney responded that she would be "skipping ahead," and she skipped over about two years of the class period to June 1991. She referred to various matters which she considered adverse developments, without specifying that a substantial charge against earnings should have been taken (SM 78 *et seq.*).

The Court asked again if a time came when plaintiffs would argue that there should have been a substantial charge against income. The attorney responded that there should have been such a charge at least by the second quarter of 1991 in the Dow Corning Form 10–Q for the quarter ended June 16, 1991 (SM 91). But nowhere in the oral argument or in the briefing do plaintiffs set forth any reasoned basis for a $1 billion charge or any alternative amount which should have been charged to Dow Corning's income in June 1991 or at any other time during the class period. To the extent that the complaint may reflect a theory that there was a $1 billion liability exposure because the Dow Corning implants had been sold to 800,000 women, this is obviously not grounded on any real analysis of the factual record.

Plaintiffs argue that even if a $1 billion or other substantial charge was not required, nevertheless the Corning and Dow Corning reports should have included descriptive material warning of the potential for massive litigation and liability involving Dow Corning and for serious financial consequences to both Dow Corning and Corning which would follow therefrom. In effect, plaintiffs are arguing that there should have been a kind of "verbal" $1 billion charge. Plaintiffs urge that Corning should have conceded the validity of the *Stern* verdict, and Judge Patel's ruling sustaining that verdict, as affecting Dow Corning's *entire breast implant operation*, and should have "disclosed" inadequate testing and generalized dangers in the product, which Dow Corning had marketed to hundreds of thousands of women, creating the potential for liabilities commensurate with those dangers.

Corning, of course, knew of the *Stern* verdict and of Judge Patel's ruling. But this was only one of four verdicts in the years 1980–1990, the other three being defense verdicts. Dow Corning and Corning were not required to accept the validi-

ty of one jury verdict and one judge's ruling as establishing the facts for an entire product, and indeed an entire industry, which had been in existence for at least 20 years. This is particularly true in view of the fact that the *Stern* lawsuit was neither accompanied by nor followed by lawsuits or claims even approaching an indication of a widespread or general problem with the implants.

It is necessary to deal with the allegation that, aside from the *Stern* lawsuit, Corning knew of inadequacies in testing and of dangers in the implants, which threatened massive lawsuits and liabilities.

Of great significance in this regard is the public release in July 1991 of the 10,-000 pages of materials covering 30 years of research and the release of the accompanying summaries. Although plaintiffs undoubtedly disagree with the conclusions voiced about the safety of the implants, plaintiffs have not attacked the detailed analysis, and indeed have suggested that such analysis should have been made public much earlier. To be sure, this analysis contains substantial discussion of possible adverse complications which can be produced by the implants. But viewed as a whole, the analysis supports the conclusion that the implants are safe, subject to possible adverse effects which are the exception. As would be expected, the analysis relied not only on testing but on what had occurred in the actual usage of the implants over the period of 27 years. The product had assisted women both physically and psychologically, and the results were satisfactory in the vast majority of cases. Of course there were exceptions, as the analysis spelled out in detail.

One of the studies which had been carried out before July 1991 was the geltox study, reported on at Dow Corning board meetings in 1987 and 1988. The results of this study negated the possibility of a certain type of malignant disease.

The position consistently taken by Dow Corning personnel in addressing the board of directors of that company (including, of course, the Corning representatives) was that the breast implants were a safe and beneficial product. This is exemplified in the statement made by Anderson and Steinhoff of Dow Corning at the board meeting of December 4, 1991, assuring the board of their "deep and long-held conviction, that we are providing a safe product, that meets the physical and psychological needs of millions of women."

This and other similar statements to the Dow Corning board cannot be put down as merely self-serving. For one thing, they are supported by the conclusions reached by Judge Pointer's panel of experts in 1998.

It is surely true that Corning knew, at least by late 1990, that there was a substantial degree of public debate about the safety of breast implants, as described earlier in this opinion. Discussions in the news media and testimony at the Congressional inquiry gave voice to implant recipients and others who described breast implants in dire terms as to their dangers and their ill effects. This was of serious concern to both Dow Corning and Corning, as reflected by the Dow Corning board minutes, the Houghton diaries, and the depositions of executives. Houghton noted in one diary entry a concern about whether this would "turn into another asbestos," and in another entry he wrote, "Lawsuits will come regardless of whether we stay in or get out." But he also wrote in his diary that Dow Corning was right, and that Dow Corning is convinced that right is on their side in view of "Doctor, medical evidence, etc."

Dow Corning's response was to pursue its application before the FDA, and most

importantly, to make the public release of the 10,000 pages relating to its testing, together with the detailed summaries of the benefits and possible complications.

The news of this public debate must be assumed to have reached the investment market. *See Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir.2000). It is of interest that the price of Corning common stock held steady, and indeed increased, during this time, and only experienced the substantial decline when the FDA moratorium was announced.

It is now necessary to review the record regarding the lawsuits and the non-litigation claims by purchasers of Dow Corning implants, asserting defects and adverse consequences. Indeed, on the issue of whether there should have been a disclosure regarding potential lawsuits and liabilities, the real questions are: (1) What had been the record thus far regarding lawsuits and other claims? and (2) Was there any reason to project a substantial change based on the circumstances which existed in the class period?

The Dow Corning implants had been on the market since 1964—a period of 25 years by the time of the start of the class period in 1989. The parties to this case agree that about 800,000 implants had been sold by the time of the class period. Taking the total of plaintiffs suing and non-litigation claimants making claims, the average for the years 1980–1983 was 59. As a fraction of the 800,000, this was .00007. As already shown, the amounts spent annually on settlements of lawsuits and non-litigation claims in the years 1980–1983 were small fractions of 1% of the net income of Dow Corning. Corning's share of those settlements was only a few hundredths of one percent during 1980–1983.

In 1984, the year of the *Stern* verdict, the total of *new* plaintiffs filing suits and new claimants making litigation claims was 92. As a fraction of the 800,000, this was .0001. The total of settlements in 1984, plus the amount of the *Stern* verdict, was 2% of the net income of Dow Corning. Corning's share was 1%.

If there were widespread complaints about the implants lurking, *Stern* might have been a signal for a large increase in lawsuits and other claims. But it was not. The number of plaintiffs filing lawsuits the year after *Stern* rose from 22 in 1984 to 39 in 1985 but then dropped back. In the years 1985–1990 the annual average number of plaintiffs bringing suits was 20. After *Stern* the number of non-litigation claims rose to a somewhat higher level than before, but not anything of a truly large dimension. The annual average number of such claims in the years 1985–1990 was 128. The annual average of plaintiffs filing suits plus claimants making non-litigation claims for the years 1985–1990 was 149. As a fraction of the 800,000, this was .00019. The appropriate percentage comparisons of settlement amounts with net income during the years 1985–1990 were fractions of 1% for Dow Corning and smaller fractions of 1% for Corning.

It is true that the number of lawsuits and non-litigation claims increased in 1991. This was a time of public debate about breast implants. But even these increased numbers of suits and other claims were very small in comparison with the number of implants sold. In that year 238 plaintiffs filed suits and 259 claimants made non-litigation claims, for a total of 497. As a fraction of 800,000, this was .00062. Of even more importance, the lawsuits and claims were being settled in 1991 for very modest amounts. The average lawsuit settlement in 1991 was $24,688, which was down from the average of $64,292 in 1990. The average non-litigation claim settlement in 1991 was $3,901, which was up

from $2,721 in 1990, but was still of a low magnitude. The total of settlements of lawsuits and non-litigation claims in 1991 was $524,922, down from $907,534 in 1990. The $524,922 was 3/10% of Dow Corning's net income, and Corning's share was 8/100% of Corning's net income.

The *Hopkins* verdict, awarding $800,000 in compensatory damages and $6.5 million in punitive damages against Dow Corning, was handed down on December 10, 1991. This was almost a month after the final Corning report involved in this action—the Form 10–Q for the third quarter, signed November 15, 1991. It is of interest to note that the *Hopkins* verdict was widely reported. Yet Corning stock rose from 77 1/4 on December 10 to 81 5/8 on December 14.

If we assume that the financial statements of Dow Corning and Corning during the class period should have included descriptive material rélating to the subject of breast implant claims and liabilities, what would such descriptions actually have said? They would have necessarily presented the fact that the number of lawsuits and claims was literally infinitesimal in comparison with the number of implants which had been sold. During the period 1980–1990 only one out of four lawsuits tried to conclusion had resulted in a plaintiff's verdict. That verdict, rendered in 1984, had led to no increase in suits or claims of any significance. Almost all claims were being settled at total costs which represented fractions of 1% of the net income of Dow Corning, with even smaller fractions of 1% representing Corning's share as a percentage of its net income.

This opinion has not thus far dealt with the question of insurance, because the evidence does not show specifically how the insurance applied to liabilities or settlements of breast implant suits or claims, including issues about deductibles, etc.

But Dow Corning and Corning did have over $1 billion in liability insurance coverage. *See In Re Dow Corning Corp.,* 86 F.3d 482 (6th Cir.1996); *In Re Dow Corning Corp.,* 287 B.R. 396 (E.D.Mich.2002). Consequently, any description of the beast implant liability issue in Corning financial statements would undoubtedly have referred to the matter of insurance.

But the essential point is that during the class period, the facts about breast implant suits and claims were highly favorable to Dow Corning and Corning. Of course there was no legal requirement to set forth in detail this favorable picture in the reports issued during this class period. As to defendant Corning, it did exactly what accounting practices required, which was to include a disclaimer in the Form 10–Ks, stating that there were no pending legal proceedings against Corning or any of its subsidiaries "which are material to the consolidated financial statements."

It follows from the facts just summarized that, during the class period, there was no basis for postulating in any form potential exposure to thousands of lawsuits and liability exposures sufficient to result in losses to Dow Corning and Corning. There were no existing lawsuits or claims even beginning to approach something of this magnitude. There was no trend toward such a thing. Even in 1991, the increase was still very small.

This picture changed drastically, but the change came after the FDA moratorium. There is no hint of any evidence that this was foreseen by Dow Corning or Corning.

Defendant Corning is entitled to summary judgment dismissing Count I of the complaint, which is brought under Section 10(b) and Rule 10b–5. It has been conclusively demonstrated on this motion that Corning has no liability under the statute and rule. There is no issue requiring trial.

## II. Section 20(a) Claim

Count III alleges that Corning is liable under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), for Dow Corning's violations of Section 10(b) and Rule 10b–5. The Court rules otherwise.

■ Section 20(a) of the Securities Exchange Act states:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

In order to make out a prima facie case of liability under § 20(a), plaintiff must show a primary violation by a controlled entity, control of the primary violator by the defendant, and that the controlling entity was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled entity. *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998); *Dietrich v. Bauer,* 126 F.Supp.2d 759, 764 (S.D.N.Y. 2001). The requisite level of control over a primary violator may be proved by demonstrating that the defendant possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2.

■ Based upon the facts already found, it must be concluded that there was no culpable participation by Corning in any securities law violation. Moreover, the evidence demonstrates that Corning, although the owner of a substantial 50% interest in Dow Corning, did not have the power to give directions or orders to Dow Corning. Therefore, Corning was not a controlling entity as to Dow Corning. Finally, the same evidence that shows that Corning did not commit a securities law violation shows the same as to Dow Corning.

Corning is entitled to summary judgment dismissing Count III of the complaint. There is no issue requiring trial.

## III. Common Law Fraud Claim

Since summary judgment is to be granted as to the Section 10(b) and Rule 10b–5 claim against Corning, it follows that the same result must be reached as to Count IV, alleging common law fraud.

### Conclusion

The Court grants defendant Corning's motion for summary judgment as to all claims against it and they are dismissed.

Settle appropriate judgment.